STATE, BY WALTER F. MONDALE, ATTORNEY GENERAL, v. ROBERT E. MECKLENBURG AND OTHERS.

140 N. W. (2d) 310.

February 4, 1966—Nos. 39,359, 39,360.

*Johnson, Schmidt & Thompson* and *Lauerman & Willette,* for appellants.

*Robert W. Mattson,* Attorney General, *Perry Voldness,* Deputy Attorney General, and *William J. Young,* Special Assistant Attorney General, for respondent.

NELSON, JUSTICE.

Condemnation proceedings in which Norman H. Tallakson and Anthony P. and Dorothy P. Peterson appealed to the Kandiyohi County District Court from awards for land taken from their farms for highway purposes. The state also appealed from both awards. The appeals were con-

solidated for trial and post-trial proceedings below and have been so treated on appeal to this court.

After trial separate jury verdicts were returned on October 2, 1963, allowing damages as follows:

Anthony P. Peterson, Parcel 7, in the sum of $2,039;
Norman H. Tallakson, Parcel 3, in the sum of $4,213.

The owners of the parcels each filed an alternative motion for judgment notwithstanding the verdict or for a new trial.

Peterson, as a part of his motion, moved the court for an additur to the damages awarded by the jury to increase the award to $7,000 or such other amount as the court might deem proper. Tallakson sought an additur increasing his award to $10,000 or such other amount as the court might deem proper. Both made alternative motions for a new trial on the grounds that insufficient damages were awarded by the jury, appearing to have been given under the influence of passion or prejudice; that the court erred in overruling the landowners' objection to the testimony, especially the opinion and expert testimony, of witness Robert C. Wilson, who was called by the state; that the court in its charge made a statement concerning general and special benefits which was confusing and incorrectly stated the law; that the court made other erroneous rulings on evidence, all of which were objected to by the landowners; and that the verdicts are not justified by the evidence.

The land taken was required as a part of the right-of-way of Trunk Highway No. 71, which now divides each farm. The land taken from the Peterson farm was 6.12 acres, leaving 29.01 acres remaining on the west side of the new highway and 167.75 acres on the east side. From the Tallakson farm 21.42 acres were taken, leaving 16.44 acres on the west side of the highway and 204.89 acres on the east. At the time of the taking, April 1, 1963, the Peterson farm was a tract with irregular boundaries, bordering on Lake Ringo to the west, in part on Henderson Lake and in part on County Road No. 10 to the north, and on East Twin Lake and West Twin Lake to the south and southeast. The Tallakson farm, a tract about 1 mile long and ½ mile wide, lies to the south of the Peterson farm and borders in part on Lake Ringo to the west, on the

Peterson farm to the north, on the Peterson farm and West Twin Lake to the east, and on County Road No. 27 to the south.

The farms from which the right-of-way strips were taken are situated in rolling, rural, wildlife country containing lakes, trees, marshes, and streams. Much of the Peterson farm is wooded, and as a result of the taking a considerable number of trees were removed. The farm had been devoted to stock-farming operations involving the raising of cattle, hogs, and sheep. The Tallakson farm was devoted to general farming, and many trees were removed from it also.

The roads nearest the farm prior to the taking were County Roads No. 27, No. 9, and No. 10. County Road No. 10 bounds the Peterson farm for a distance to the north. County Road No. 9 runs north and south between East Twin Lake and West Twin Lake, cutting across the Peterson farm and meeting County Road No. 10, which runs east and west. County Road No. 27 runs east and west on the south side of the Tallakson farm. Before construction of Trunk Highway No. 71 there were no roads into or on the west part of either farm. At the time of the taking neither parcel had any commercial development, although the Peterson farm was subject to a duck-hunting lease. A small private road runs from the east farm-building area of the Peterson farm to the west where it ends at the southwest corner of Henderson Lake. A trailway in the western part of the farm was seeded to pasture by Peterson in 1947.

Soil sample borings in the highway right-of-way on the Peterson property revealed gravel estimated as worth 8 to 10 cents per cubic yard and described in the record as a fairly good grade of gravel. Similar borings in the highway right-of-way running across the Tallakson farm produced samples of gravel of a similar quality.

Trunk Highway No. 71 was constructed subsequent to the taking and runs generally north and south through the west side of the farms. Except for some sodding and seeding on the back slopes and some bituminous surfacing, the new highway was completed and was being used at the time of trial. The new highway is a double-lane, 24-foot road within right-of-way boundaries that are 200 feet wide. There is access (both physical and legal) to the highway from both sides of the subject properties. At

the time of trial entrances had already been placed from the properties—on each side—into the new highway.

At the trial the owners elicited testimony as to the value of these properties before and after the taking from seven witnesses. The state called one value witness.

Mr. Peterson testified that he had sustained damages of $7,498. A breakdown of that sum was as follows: $200 per acre for 6.12 acres taken for highway right-of-way, amounting to $1,224; an additional $2,900 damages to the 29.01 acres severed from the main acreage; required temporary and permanent fencing and gates at an estimated cost of $1,874; the loss of 850 trees valued at $1,000; and loss of hunting, valued at $500.

The new trunk highway cuts through the full length of the Tallakson farm, leaving 16.44 acres on the west side of the highway severed from the balance of the farm. Tallakson claims that the highway eradicates an old cattle trail, making it necessary for cattle to ford a swamp either by swimming or wading through mud to use a 35-acre pasture. A shelter belt of trees northwest of his farm buildings, which served as a windbreak, has for the most part been removed. He contends that the new highway has essentially severed his farm into three parts, without creating any way whereby cattle might pass from the main part of the farm over to the severed portions on the west. In estimating his damages he claims $250 per acre for 21.42 acres taken for the right-of-way, amounting to $5,355; $3,400 for the loss of 1,700 trees; $1,278 for required fencing and gates; $1,200 to $1,500 for extending a culvert and adding fill to make a sufficient grade; and $4,000 for severance of the portions of the farm west of the highway. Although he testified to the difference in value of his farm before the taking and after the taking as being $12,500, the foregoing breakdown totals from $15,233 to $15,533. He testified that this estimate did not include anything for gravel underlying the strip taken for highway purposes nor any loss for hunting grounds or on sales of recreational lots.

The record indicates that since the completion of the new highway gravel mining has been undertaken on a 20-acre tract on the Tallakson farm. Upon cross-examination, however, Mr. Tallakson did not concede

that the property had received special benefits because of the construction of the new highway, saying he had planned to put in his own road which would have been better and cheaper.

When Mr. Peterson was asked whether the state offered him the trees that were removed, his reply was that he did not have time to take all of them. In estimating his damages he failed, however, to allow any offset for those he took. It will be noted also that Peterson claimed damages of $100 per acre to the severed 29.01-acre tract. Even though the cattle pass had been located as he requested, he made this estimate of damages to the severed acreage because he would have to go through gates and across the new highway to move machinery to and from the 29.01-acre tract.

The three commissioners testified in behalf of the owners. They fixed the value of the Peterson farm before the taking at $30,432, or an average of $150 per acre, and in their opinion the damages to the Peterson farm added up to about $5,396. They apparently took much the same items into account in arriving at this figure as did the owner.

Two additional value witnesses were called by the owners, Arthur J. Kloster and R. M. Konsterlie. Mr. Kloster's appraisal was made at the time the trial started although he had seen the farms during a hunting expedition at some unspecified time. He assigned the value of the Peterson farm as $45,648 before and $39,043.50 after the taking, a difference of $6,604.50. Mr. Konsterlie testified that the Peterson property was worth $40,576 before and $34,591 after the taking, a difference of $5,985.

The three commissioners also testified as to the value of the Tallakson farm, assigning a value of $36,412.50 before the taking, or $150 per acre, and a valuation of $26,155.50 after the taking, a difference of $10,257. This was $1,000 more than they awarded as appraisers, an increase resulting from the fact they had later discovered the need for construction of a cattle lane to permit livestock access from the farm buildings to the 35-acre pasture. Mr. Kloster valued the Tallakson farm at $54,618.75 before and $38,563.35 after the taking, a difference of $16,055.40. Mr. Konsterlie assessed its value at $48,550 before and $36,400 after the taking, a difference of $12,150.

Robert Wilson, the only value witness called by the state, was of the

opinion that the highest and best use of the Peterson farm before the taking was farming. He valued the farm at $28,650, which averaged out to $145 per acre, before the taking. He had determined that there were 130 acres of tillable land which he valued at $150 per acre. He testified that the balance of the farm, besides about 6 acres of roads and about 5 acres of unusable waste land, consisted of about 61 acres of timber and pasture land on which he placed a valuation of $50 per acre. The balance of his valuation was the value of the buildings on the farm. He expressed the opinion that the Peterson land was worth more since completion of the highway than it had been before, appraising its value after the taking as $29,241. The record indicates that he based his opinion upon the consideration that the new road gave the 29 acres remaining on the west side a changed use because this particular wooded lakeshore area had become accessible from the highway and thus had acquired a significantly greater value as potential residential property. He felt that the land east of the highway continued to be best suited for combined livestock and grain farming but was specially benefited, to the extent at least that the 29-acre tract could be put to a higher economic use. A special benefit, as it relates to a parcel of real estate involved in condemnation, meant to Mr. Wilson—

"* * * an individual and distinct benefit that an individual property owner would receive from a highway, or any specific change in his land, as against a general benefit which would simply * * * be of general benefit to the public passing through or by the land."

Wilson testified further that, while the value of the land west of the highway was increased, he had valued the remaining acreage on the east side on the basis he had used earlier but had treated some of the tillable land as pasture land to retain the same ratio of pasture to crop land in that part of the farm as had existed in the whole property prior to the taking.

With the foregoing approach Wilson found that the construction of the new highway had increased the value of the property. Approaching the question "item by item," he felt that compensatory adjustments would call for paying the cost of fencing farm area on the east side of the highway and paying for loss of pasture area in the acreage taken, which he

had previously estimated at $50 per acre. He computed these items as amounting to $778.

Wilson stated that in his opinion the highest and best use of the Tallakson property before the taking was farming, with a potential gravel resource in a separate area. He gave the Tallakson farm the value of $30,487 before the taking, an average valuation of $120 per acre. In his opinion the highest and best uses of the farm after the taking were farming and gravel operations to the east of the highway and residential use to the west. He testified to a value of $33,930 after the taking, stating that the 16.44 acres west of the highway had become usable as residential tracts while previously they had been inaccessible; that the 20-acre site east of the highway mined for gravel only after the taking was enhanced in value because the new highway had made it economically feasible to mine, transport, and market the gravel. From the viewpoint of market value Wilson's final opinion was that special benefits had accrued to the Tallakson farm to such an extent that these outweighed any damages incurred by the taking. On an actual-cost or physical-damages approach, Wilson estimated that the damages to the farm could fairly be estimated by taking into account necessary fencing and a cattle lane at a total of $2,015.

After Wilson had concluded his value testimony, the owners called Willard DeRuyter and Konsterlie in rebuttal. DeRuyter, a farmer and one of the three commissioners who worked on the original valuation of the properties, testified that he had not changed his opinion about the damages from the highway construction. To him it had resulted in damages and not in special benefits. He further stated that the other commissioners had not found special benefits. Mr. Konsterlie, who apparently had not considered what the lakeshore areas would sell for after construction of the road, nevertheless on rebuttal stated that he also found no special benefits to either property and did find damages.

During the trial the jurors, with counsel for both sides present, had an extended view of both the Peterson and Tallakson properties. The court explained the purpose of the view as follows:

"* * * This view, it is considered by the Court, will be helpful to you. What you see out there will not be evidence in the case. You will

still decide the case on the evidence you have received here in the court-room, but this view will enable you to understand and apply the testimony that you have heard much better than if you did not have a chance to see the property that is involved, and that is the whole object of this view."

Pursuant to agreement between court and counsel, one form of verdict was given, under which the jury could find the damages to each property in one lump sum instead of specifying a separate amount for the property taken and a separate amount for damage to what remains.

The owners subsequently moved for judgment notwithstanding the verdict and the making of additurs in both cases (an increase to $7,000 damages for the Peterson farm, and an increase to $10,000 damages for the Tallakson farm) or for new trials. The court denied the motions for new trials if the owners and the state consented to additurs (an increase from $2,039 to $2,614 on the Peterson farm, and an increase from $4,213 to $5,213 on the Tallakson farm). The court further ordered that the motions, including the motions for additur, be denied, if the state filed its consent and the owners did not. In the absence of consent by the state a new trial was granted on all issues. The exercise by the court of its discretion in the foregoing manner prejudices neither party's interest and in no way gives less than full review on the question of damages. See Genzel v. Halvorson, 248 Minn. 527, 80 N. W. (2d) 854, wherein this court held that additur, the practice of the court to condition a denial of a new trial on the defendant's consent to an increase in the judgment, is within the constitutional power of the court.

■ It is the contention of the owners here that insufficient damages were awarded by the jury, appearing to have been given under the influence of passion or prejudice. This gives rise to the question whether the verdicts were justified by the evidence. The owners contend that the evidence supplied by their witnesses compels the conclusion that the actual damages were greatly in excess of the amount granted by the jury. They say the state failed to offer evidence to dispute the testimony of their witnesses, claiming that Mr. Wilson was extremely unrealistic in his valuations and, thus, that there was in fact no dispute on valuations.

However, the record indicates that much business activity in the area

followed construction of the new highway, as is demonstrated by testimony as to sales of properties and increased demand for other properties for residential purposes and recreational uses. It would appear that Mr. Wilson treated the 29.01 acres of the Peterson farm on the west side of the highway as having a higher use because at least part of the tract had lakeshore frontage. In view of the testimony of William T. Estrem, one of the commissioners, that he had recently sold a 13-acre tract which he described as having lakeshore frontage but needing considerable fill to prepare it as residential lakeshore property, Wilson's opinion that the use of the 29-acre tract had been changed by the highway's presence seems merited. Certainly it cannot be said there was no dispute in the evidence concerning the effect of the highway construction on the value of the properties. In fact, a basic dispute runs through the whole of the cases involving these parcels, the owners claiming a loss of value to their lands because of the construction of the highway and the state contending that these same lands increased in value because of it.

The owners used a method of appraising that allowed them to average out a value per acre of the land taken and then use that value as the basis for farm, residential, and gravel-loss damage at the same time. The state produced evidence of values of the properties before the taking and after the taking without such a conflict of different uses for the same areas of the properties. The state also produced testimony that indicated some of these remaining lands were specially benefited by the highway's opening access to those lands.

The state contends that the owners' evidence showed a singular and limited approach to the problems: Their witnesses concentrated their attention and testimony on that part of the real estate that was taken, the various features of that property (such as the number of trees it contained), and the particular utility that it had; and on various features that related to damage to the remaining land. In other words, the state says, their idea was to concentrate on each individual item of damage and assess their total as damages for each individual parcel. While the owners and their witnesses ascribed a value for each parcel as representing the market value of the parcel before the taking, yet it became readily apparent that the total itemized damages were then simply subtracted from

the market value to reach a supposed market valuation of the remaining property. The state claims that this type of valuation presents a serious flaw because the various items that enhanced the worth of the acres taken were only ascribed to the roadway or land taken and were not credited or valued on parts of the land that were not taken.

It would seem, however, that this must have become quite apparent to the jurors in making their evaluation under the instructions of the court. Of course, the major objection to such an approach is that it would preclude any consideration of special, unique benefits that inure to the remaining property because of a road improvement. The record is clear that all of the value witnesses called by the owners and the owners themselves never gave consideration to the possibility of such special benefits. The state's value witness did, and gave his explanation therefor. While the owners' witnesses then recalled on rebuttal stated that in their opinion there were no special benefits, whether there were, and their value, was properly for the jury to determine.

The state also contends that the record shows inconsistency in the approach taken by the owners and their witnesses regarding inconsistent uses and values ascribed to the same piece of land, whether taken by the state or left remaining. The state's valuation witness appraised by determining what each farm would sell for before the taking, through examining the entire farm and noting its particular utilities, referencing this approach with other properties as well, including sale of such properties. The state argues that by reason of this careful examination the witness could describe the effect of the highway construction upon the uses to which the remaining properties could be put and show that because of the highway they had two uses on separate and well-identified areas.

Without further discussing the different approaches taken by the parties to the question of damages, it appears to us that the verdicts have support in the evidence. There is little dispute about the physical characteristics of the properties before the taking. The evidence of the sales of, and demand for, like property for recreational and residential purposes since completion of the highway and of the gravel operations instituted thereafter could well be considered by the jury in determining the compensation to which the owners were entitled. We are unable to see from their

amounts that the verdicts are the result of passion or prejudice, and the record contains nothing to indicate that the jury was influenced or motivated thereby. Housing & Redevelopment Authority v. First Ave. Realty Co. 270 Minn. 297, 133 N. W. (2d) 645. The propriety of determining whether benefits from an improvement offset damages for the taking was set forth in the early case of Haynes v. City of Duluth, 47 Minn. 458, 50 N. W. 693, and later followed in Burg v. Township of Rosedale, 143 Minn. 424, 174 N. W. 309.

The owners contend that the trial court was in error in overruling their objection to the testimony of Mr. Wilson, who, over the owners' objections on the ground of lack of foundation, was permitted to give his opinions as to market values of the owners' lands before and after the taking. The record indicates that Mr. Wilson made his first examination of the properties on Friday of the week preceding the trial, thereafter had made several trips to these farms, and had thoroughly inspected them before trial. He had hunted in this area during the past 9 or 10 years and in the last 3 or 4 years had been looking for a lakeside cabin to buy in this vicinity. He had also worked in this area for two summers. He has operated a real estate business in Excelsior since 1955 and has bought and sold residential properties in and around Lake Minnewashta and Lake Minnetonka and farm properties in Carver, Scott, and Wright Counties. He has appraised such properties in condemnation proceedings, both for the state and owners, and worked a year for the State Highway Department to obtain more experience in this field. The owners claim, however, that he lacked a firsthand observation of that which he testified about and that his opinions were based upon hearsay.

The owners based the lack-of-observation argument upon the fact that Wilson had made no personal observation of the properties prior to the taking. The hearsay argument relates to property valuations derived from inquiry of other persons. The knowledge possessed by Wilson, however, was the result of his training and experience in this field. He gained additional data on sales and related market data as a result of his personal investigations and appraisals. He also acquired some knowledge of the area when attempting to buy lakeside property in the region. He had also listened to the owners' testimony. It may be observed that he

never at any time volunteered and was never asked the specific sales price of any particular parcel of property nor any other details concerning a specific sale. Opposing counsel conducted a searching cross-examination, but never requested that his testimony be stricken.

This court held in Hafner v. Ritzinger, 256 Minn. 196, 97 N. W. (2d) 839, that a person who had been engaged in appraising real estate over a number of years was sufficiently qualified to give an opinion as to value even though he had not actually bought and sold such property. In the Hafner case plaintiff contended that an expert witness called by defendants on the issue of the value of property lacked qualifications to testify because he had not bought and sold real estate in Ramsey County. The witness had been a real estate appraiser since 1938 and had appraised property extensively in Ramsey County. In holding that the witness was qualified to testify as an expert on value, we said that appraisal of real estate necessarily involves a determination of value; that the determination of the sufficiency of the qualifications of an expert witness rests largely with the trial court; and that it obviously is not necessary to buy and sell real estate in order to be able to determine its value. See, also, Curtis v. St. Paul, S. & T. F. R. Co. 20 Minn. 19 (28); 6 Dunnell, Dig. (3 ed.) §§ 3073 to 3075; Annotation, 159 A. L. R. 7.

Objections similar to those against Wilson's testimony were raised against experts in the case of Finley v. Board of County Commrs. (Okla. Dec.) 291 P. (2d) 333, 335:

"* * * Defendants' complaint, however, goes to the fact that the personal examination of these experts was not made until after the date of the taking. It is apparently defendants' contention that the opinion of an expert as to the value of the property prior to the taking must be based upon a personal examination made prior to the taking. They cite no authority to that effect, however, and we know of none. Defendants argue that to hold otherwise would allow testimony of an expert based on hearsay, which cannot be done. A complete answer to such argument is found in the case of H. & H. Supply Co. v. United States, 10 Cir., 194 F. 2d 553, 556, wherein the court said:

" 'It may be conceded, as contended, that both Dooley and Sidwell re-

lied in part upon hearsay sources in reaching their conclusions as to value, but this does not make their testimony as to value inadmissible. The rule is well established that an expert may testify as to value, though his conclusions are based in part, or even entirely, upon hearsay evidence.' "

In this case pictures and maps were in evidence that depict and illustrate the areas involved before the taking. As indicated, the jury itself had had a view of the properties during the trial, which helped them to understand the evidence. Clearly under those circumstances the trial judge in the exercise of reasonable discretion could sensibly conclude that the weight of Wilson's testimony could be determined by the jurors.

■ While the jury was entitled to receive the benefit of whatever assistance it could obtain from Wilson, as well as the other value witnesses, the weight of that testimony was to be determined by the jury and it was not, in any sense, bound by the opinions of any witness. See, 6 Dunnell, Dig. (3 ed.) § 3072; State, by Lord, v. Shirk, 253 Minn. 291, 91 N. W. (2d) 437. We held in the Shirk case that in determining value of land taken in proceedings in eminent domain for highway purposes jurors are not limited to the knowledge which they acquire from the evidence adduced. They may rely in part upon the evidence of their own senses and upon their general knowledge and experience. The opinions of experts are merely advisory and the jury is not bound by the amounts stated by such experts. The rule is stated in 5 Nichols, Eminent Domain (3 ed.) § 18.1, as follows:

"Generally, the arbiters of the facts, in valuing the land appropriated, are not limited to the knowledge which they acquire from the evidence adduced. They may rely, in part at least, upon the evidence of their own senses when engaged in a 'view' of the premises and upon their own general knowledge and experience. Value is always a matter of opinion. *The opinions of expert witnesses are merely advisory. If they agree with common sense and human experience, well and good. If, however, they differ from ordinary observation, human experience and common sense they may well be ignored."* (Italics supplied.)

This court, since Johnson v. Chicago, B. & N. R. Co. 37 Minn. 519, 35

N. W. 438, has consistently held that opinion evidence as to value is not conclusive upon the jury in determining damages. Stevens v. City of Minneapolis, 42 Minn. 136, 43 N. W. 842; Olson v. Gjertsen, 42 Minn. 407, 44 N. W. 306.

The owners claim that the court in its charge made a statement which was confusing and did not state the law correctly. That portion of the charge, with the word "damages" italicized where it was inadvertently used in place of the word "benefits," was as follows:

"The claim is made here that there are some special *damages* that have accrued to these parcels of land by reason of the construction of the highway. You should make no deduction from the amount of damages you find by reason of special *damages* unless the *damages* are peculiarly accrued to the particular land in question. *Damages* which result to the general public, or benefits, rather, which result to the general public, or *damages* which result to all of the people along the highway in the area are general *damages* and—are general benefits and are not deductible. Special benefits must be benefits which accrue to the particular land in question only." (Italics supplied.)

The jury had, however, been told how to determine damages:

"You will proceed as follows in determining what is fair compensation in each case before you: you will first determine the fair market value of the tract of land before the taking, that is, before the road was constructed on it and before the land was taken for that purpose. You will then determine the fair market value of the land with the highway on it, constructed; deduct the fair market value of the land after the taking from the value before the taking, and the difference will be the amount of damage sustained. Now, of course, if the value of the land after the taking is equal to or more than the value of the land before, then, of course, there has been no damage."

After giving the portion of the charge which the owners claim was incorrect and confusing, the court also said:

"In determining the damages sustained, you should remember that the landowners are entitled to compensation for the highest and best use that the land can be put to, whether it is actually being put to it now or could

be in the reasonably near future. You should also take into consideration in determining fair market value all of the items that have been mentioned and discussed in the evidence here, in this case, and allow damages for any of those items which you feel have been reasonably proved, and in a reasonable amount.

\* \* \* \* \*

"In filling out your verdict, you should insert the amount of damage you find for each individual landowner in one lump sum in the blank space provided. If you find that the damages and benefits, special benefits which I have mentioned, are equal, or if the special benefits are larger than the damages, then you will write the word 'none' in that blank space. There will be no damages."

It is clear, when the above paragraphs from the charge are scrutinized, that the inadvertent statements made were corrected and, when the whole charge is considered, that the jury was not and could not have been misled. Before giving the instructions the court requested counsel to follow them and to call any misstatements or omissions to the court's attention at the close of the charge. The inadvertent use of the word "damages" for "benefits" was clarified by the language later used and it must have been so understood by counsel, who had no criticisms or additions to offer when the charge was completed. In State, by Lord, v. Hayden Miller Co. 263 Minn. 29, 116 N. W. (2d) 535, 536, we stated:

"Where part of a tract is taken by eminent domain, the owner is entitled to the difference between the market value of the tract immediately before the taking and the market value of what is left after the taking, excluding from consideration general benefits and deducting from the difference special benefits.

"The measure of damages in condemnation cases comprehends that the award shall be a single award for the entire damage for the land actually taken, including as well the harm resulting to the remainder because of the taking; and damage which the landowner may sustain by reason of inconvenience affecting the use and enjoyment of the remainder may be considered by the jury not as an independent item of loss but as an element which affects the market value of the remaining area."

The requirements of the foregoing rule as to the measure of compensation were fully met by the trial court's instructions in this case.

In support of their claim that the charge was so inconsistent and confusing as to require reversal, the owners cite the Hayden Miller case. An examination of the charge here does not show an incorrect statement of the law in the first instance followed, later, by a correct statement of the law, as in the cited case. This case is one where the court, making an inadvertent slip, immediately corrected itself and later repeated the rule in the corrected form. It was not, therefore, an inconsistent charge. It would seem clear that if there was any error in the instructions it was harmless. Certainly, the owners, having failed to object at the completion of the charge, cannot now complain. In Caballero v. Litchfield Wood-Working Co. Inc. 246 Minn. 124, 127, 74 N. W. (2d) 404, 407, this court said:

"* * * Unintentional misstatements and verbal errors or omissions in the charge, which have not been objected to before the jury retires—with a distinct statement to the trial court of the alleged errors and the grounds of the objection—, may not, however, be assigned as error for the first time in the motion for a new trial."

See, also, MacIllravie v. St. Barnabas Hospital, 231 Minn. 384, 43 N. W. (2d) 221.

■ We have examined other rulings on evidence which were objected to by the owners and find no prejudicial error therein. The objection that the verdicts are not justified by the evidence has already been fully covered in our analysis of the testimony given by the value witnesses. The rules followed in Burnquist v. Cook, 220 Minn. 48, 19 N. W. (2d) 394; Krueger v. Henschke, 210 Minn. 307, 298 N. W. 44; and O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430, cited by the owners in support of their claim that the verdicts are not justified by the evidence, were applied to situations different from that presented here. In our view they are in no manner conclusive of the issues in this case. This is true also of Seydel v. Reuber, 254 Minn. 168, 94 N. W. (2d) 265, also cited by the owners.

There is nothing in the record to indicate that the state's witness, Wil-

son, was not well qualified to express his opinions regarding the properties in question. The jury may well have come to the conclusion that his testimony was the most realistic basis for resolving the conflicting testimony on the valuation issues.

The prevailing party below is entitled to the benefit of the rule that we view the evidence in the aspect most favorable to the jury's verdict. Thus viewing the record as a whole, we conclude that the verdicts as they now stand after additurs ought not to be disturbed.

Affirmed.

OTIS, JUSTICE (concurring specially).

I concur in the result.