**STATE of Minnesota, Respondent,**

v.

**Michael GEBREMARIAM,
petitioner, Appellant.**

**No. C8-97-59.**

Supreme Court of Minnesota.

April 15, 1999.

Michael C. Davis, Special Asst. State Public Defender, St. Paul, for appellant.

Michael A. Hatch, Minnesota Attorney General, Catherine M. Keane, Asst. Attorney General, St. Paul, Raymond F. Schmitz, Olmsted County Attorney, Rochester, for respondent.

## OPINION

STRINGER, Justice.

In the early hours of New Year's Day 1995, an altercation occurred in a hot tub at the Ramada Inn in Rochester, Minnesota. Hostilities rapidly escalated to the point where appellant Michael Gebremariam threw beer bottles and liquor bottles at the victims, for which he was charged with second-degree assault with a dangerous weapon. At trial, the first and second sets of trial court instructions as to the charged offense were in error. On the third attempt, the trial court instructed the jury in accordance with the appropriate CRIMJIG and conviction followed. The court of appeals concluded that the jury was correctly instructed in the final instructions, and thus the initial errors were not prejudicial to appellant. Because we determine that it was not beyond a reasonable doubt that the errors in trial court's instructions did not contribute to appellant's convictions, we reverse and remand for a new trial.

Celebrating the New Year, appellant and his friend Duc Dong Ngoc Le joined Amy Carlson, her boyfriend Eric Norrie, and Norrie's friend Travis Newcomb in the Ramada Inn hot tub. The two groups did not know one another prior to that time. Soon after they immersed in the hot tub, appellant and Le began to splash water at the other group. Carlson first splashed them back, but then told them to "knock it off." Appellant responded that Carlson was being a bitch. Norrie demanded that appellant apologize to Carlson, but appellant refused and responded that Carlson did not deserve an apology because she was "acting like a f——ing bitch." Norrie again demanded an apology stating, "Hey, nig, I think you owe her an apology."

Appellant and Le then exited the hot tub and walked toward Norrie and Carlson. When appellant and Le were approximately 3 to 10 feet from Carlson and Norrie they began to throw beer bottles and liquor bot-

tles at them with force comparable to a pitcher throwing a baseball. Appellant claimed he threw the bottles out of fear of Norrie because of Norrie's use of racial epithets and his threatening manner. Carlson, Norrie and Newcomb all denied that Norrie made threatening movements toward appellant.

In any event, a large liquor bottle hit Carlson in the back of the head. Appellant and Le ran out of the building with Norrie and Newcomb in pursuit shouting racial epithets at appellant. A short time later Norrie and Newcomb gave up the chase and appellant and Le voluntarily returned to the hotel escorted by an employee of the Ramada Inn. Norrie's racial slurs continued as appellant spoke with police at the hotel. Carlson sustained a cut on the back of her head from being hit by a liquor bottle requiring several stitches and leaving a scar.

The state charged appellant with second-degree assault alleging that appellant violated Minn.Stat. § 609.222, subd. 1 (1998) prohibiting assault with a dangerous weapon. The statutory definition of a dangerous weapon is "any * * * instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." Minn.Stat. § 609.02, subd. 6 (1998); *see also State v. Basting*, 572 N.W.2d 281, 284 (Minn.1997). Great bodily harm is statutorily defined as "bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." Minn.Stat. § 609.02, subd. 8.

The trial court's first instructions to the jury significantly differed from the statutory definition of either the term "dangerous weapon" or "great bodily harm." The court instructed: "[a] dangerous weapon is anything designed as a weapon and is known to be capable of producing great bodily harm. Great bodily harm means bodily harm which creates a high probability of death or which causes serious permanent disfigurement." In so instructing, as to the dangerous weapon definition the trial court substituted "anything" for "instrumentality," injected the term "designed as a weapon" and omitted the

reference to "manner it is used or intended to be used." The trial court further substituted "capable of producing great bodily harm" for "calculated or likely to produce death or great bodily harm." With respect to the definition of great bodily harm, the trial court entirely omitted the last phrase "or which causes a permanent or protracted loss of impairment of the function of any part of the body or other serious bodily harm."

The trial court soon realized its error in the definition of great bodily harm and after bringing the error to the attention of counsel, instructed the jury a second time, stating in part:

> A dangerous weapon is anything designed as a weapon and is known to be capable of producing death or great bodily harm. Great bodily harm means bodily harm which creates a high probability of death or which causes serious permanent disfigurement or which causes a permanent or protracted loss of impairment of the function of any part of the body or other serious bodily harm.

Thus the court corrected the great bodily harm instruction but repeated its first erroneous instruction on the dangerous weapon definition.

Shortly after deliberations began the jury asked for clarification of the definition of a dangerous weapon. The court and counsel then realized that both previous sets of instructions had omitted a portion of the definition of dangerous weapon. In the third instruction the court followed the appropriate CRIMJIG standard, 13 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 13.06 (3d ed. Supp.1998), and instructed that a dangerous weapon is "anything which in the manner it is used or intended to be used is known to be capable of producing death or great bodily harm."[1]

Elementary to a fair trial and due process is that the jury is fully and accurately instructed as to the elements of the charged offense in a context of sufficient clarity and rationality that the jury can apply them to achieve a fair result. *See generally Swanson v. La Fontaine*, 238 Minn. 460, 469,

---

1. CRIMJIG 13.06 is itself at variance with the     statutory definition of a dangerous weapon.

57 N.W.2d 262, 268 (1953); *State v. Hutchison*, 121 Minn. 405, 409, 141 N.W. 483, 484 (1913). That did not happen here. Because the jury verdict would be based almost exclusively on whether the bottles were "dangerous weapons" and "likely to produce great bodily injury," fair and accurate instruction on these definitions was critical. The court's first and second instructed definitions referring to a dangerous weapon as "anything designed as a weapon" surely would have significantly misled the jury as to the instrumentality. Similarly the court's first instructions on great bodily harm omitted a major category of the physical injury consequences of using a dangerous weapon.

■ Ultimately the jury was accurately instructed on the elements of the charged offense,[2] and there is no contention at this point that the third set of instructions was not error-free.[3] But our concern as to whether the jury was fairly instructed is not so easily resolved given the numerous errors that pervaded the first two sets of instructions. In *Randall v. Goodrich–Gamble Co.*, 238 Minn. 10, 54 N.W.2d 769 (1952), we ordered a new trial where "[t]he instructions of the court [were] so ambiguous * * * that the majority of the court [felt] that there should be a new trial in the interests of justice." *Id.* at 14, 54 N.W.2d at 771. Regardless of whether the errors favor one party or the other, we have grave doubts that after the fundamentally incorrect definition of the basic elements of the charged crime—"dangerous weapon" and "great bodily harm"—a third definition, even if correct, could sufficiently inform the jury as to the charged offense or assure a fair verdict under the circumstances here.

Where the multiple, inconsistent and incorrect instruction may well have confused the jury, we conclude that the appellant's conviction must be reversed and a new trial ordered in the interest of justice. *See* Minn. R.Crim. P. 28.02, subd. 11; *State v. Kaiser*, 486 N.W.2d 384, 387 (Minn.1992); *Randall*, 238 Minn. at 14, 54 N.W.2d at 771.

Reversed and remanded.

PAGE, Justice, took no part in the consideration or decision of this case.

PAUL H. ANDERSON, Justice (concurring specially).

I concur in the result reached by the majority, but I write separately because I disagree with the analysis used by the majority. Here, we have an unobjected-to error regarding jury instructions. The dissent is correct when it asserts that, under these factual circumstances, we must apply a plain error analysis. We have made this point as recently as last year in *State v. Griller*, 583 N.W.2d 736, 740 (1998). In *Griller*, we said:

The United States Supreme Court has established a three-prong test for plain error, requiring that before an appellate court reviews an unobjected-to error, there must be (1) error; (2) that it is plain; and (3) the error must affect substantial rights. If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings.

*Griller*, 583 N.W.2d at 740 (citation omitted). Based on *Griller*, if we agree that the three prongs of a plain error analysis are met, then we proceed to assess whether we should address the error to ensure fairness and the integrity of judicial proceedings. *Id.*

The correct focus of our review should be on the third prong of the plain error analysis because the first two prongs are essentially uncontested—it is plain that the first two sets of jury instructions were erroneous. When we focus on this third prong, it is the appellant who bears the "heavy burden" of persuasion that there is a "reasonable likelihood that the giving of the instruction[s] in question would have a significant effect on the verdict of the jury." *Id.* at 741 (quoting

2. We are not hesitant to affirm a conviction when the jury's instructions are corrected where it is apparent that the accused has suffered no prejudice. *See State by Mondale v. Mecklenburg*, 273 Minn. 135, 150, 140 N.W.2d 310, 319–20 (1966); *Goodsell v. Taylor*, 41 Minn. 207, 210, 42 N.W. 873 (1889).

3. Thus the fact that neither counsel objected to the erroneous instruction is irrelevant, as is the concern of the concurring and dissenting opinions relating to the necessity of harmless error analysis.

from *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990)). However, when applying the plain error analysis, I come to a different conclusion than does the dissent. For the numerous reasons set forth in the majority's opinion, I conclude that the appellant did carry the burden of demonstrating that the erroneous jury instructions did affect his substantial rights. Appellant has shown that there is a reasonable likelihood that the giving of the erroneous instructions had a significant effect on the jury's verdict.

Having concluded that all three prongs under a plain error analysis are met, we must next decide whether it is necessary to address this plain error to ensure fairness and the integrity of the judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 469–70, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). I conclude that fairness and the integrity of the judicial process will be compromised if we do not reverse and remand for a new trial.

GILBERT, Justice (dissenting).

I respectfully dissent. While I agree with the majority that the trial court committed errors, I do not agree that those errors mandate reversal. As a general rule, when a party raises an issue for the first time on appeal, we review the party's claim by using a plain error analysis. *See State v. Cross*, 577 N.W.2d 721, 723 n. 1 (Minn.1998); *see also* Minn. R.Crim. P. 31.02. In the past we have applied this analysis to alleged errors in jury instructions and there is no reason why we should not apply the same analysis in the present case. *See Cross*, 577 N.W.2d at 726; *see also State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998) (applying a plain error analysis to an alleged error in jury instructions not objected to at trial).

Typically, "matters such as trial procedure, evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error." *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn.1986). Here, appellant neither objected to the erroneous instructions during trial nor raised the issue of the overall fairness of the instructions in a motion for a new trial. Instead, appellant raised these issues for the first time on appeal. The majority, however,

fails to use our plain error analysis in this case. In footnote three, the majority states "thus the fact that neither counsel objected to the erroneous instruction is irrelevant, as is the concern of the concurring and dissenting opinions relating to the necessity of harmless error analysis." The majority opinion then cites its "grave doubts" about the curative effect of the final correct instruction as grounds for reversing the conviction in the interests of justice. But the majority fails to give any reason for its departure from our usual practice of using a plain error analysis to review claims raised for the first time on appeal. I believe the appellant's claim should be reviewed under our plain error analysis rather than create a new catch-all exception to the plain error analysis.

Under our plain error analysis, we only address the error if the appellant first meets the "heavy burden" of showing that "there is a 'reasonable likelihood that the giving of the instruction in question [had] a significant effect on the verdict of the jury.'" *Griller*, 583 N.W.2d at 741 (quoting *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990)). Because the errors complained of in the present case were timely corrected by the trial court and because the record indicates that the jury had a thorough understanding of the critical issues at trial, I believe appellant has not met his heavy burden of showing that there is a reasonable likelihood that the errors committed by the court in instructing the jury had a significant effect on the verdict.

It is true that in its first attempt to instruct the jury as to the elements of the charged crimes, the court misstated the definitions of "dangerous weapon" and "great bodily harm"—both critical elements of second-degree assault, the crime for which appellant was convicted. *See* Minn.Stat. § 609.222, subd. 1 (1998). However, the court, on its own initiative and with the approval of appellant, then partially corrected this error by giving the correct definition of great bodily harm. But, in so doing, it repeated the erroneous definition of a dangerous weapon. Still, the mere fact that errors were made does not alone warrant reversal, especially since the jury later brought this remaining definitional error to the court's attention and, in response, the trial court issued the correct instruction.

The "designed as a weapon" language used in the original erroneous instructions defines dangerous weapon more narrowly than either the statute or the CRIMJIG. A dangerous weapon is defined statutorily as "any * * * instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm * * *." Minn.Stat. § 609.02, subd. 6 (1998). The applicable CRIMJIG standard defines dangerous weapon as "anything which in the manner it is used or intended to be used is known to be capable of producing death or great bodily harm." 13 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIM-JIG 13.06 (3d ed. Supp.1998) (hereinafter CRIMJIG 13.06). Seemingly, restricting the range of dangerous weapons to things *designed as* a weapon as opposed to things that *as used* are capable of or likely to produce death favored the appellant and therefore was not prejudicial.

Judges are only human, and as a consequence we have long known it to be "inevitable" that courts will sometimes make mistakes in charging the jury. *See Goodsell v. Taylor*, 41 Minn. 207, 210, 42 N.W. 873 (1889). However, for an equally long period we have recognized that such a mistake does not *per se* warrant a reversal of a conviction and that a court should have the opportunity to correct its own errors. *Id.* Therefore "it must be presumed that whenever the trial court in its charge corrects a proposition the jury accepts the correct as the law of the case." *Id.; see also State by Mondale v. Mecklenburg*, 273 Minn. 135, 151, 140 N.W.2d 310, 320 (1966) (recognizing that, even if the original erroneous instruction was prejudicial, the court corrected the error by giving a proper instruction); *Honan v. Kinney*, 205 Minn. 485, 489, 286 N.W. 404, 405 (1939) (same); *Strite Governor Pulley Co. v. Lyons*, 129 Minn. 372, 375, 152 N.W. 765, 766 (1915) (same).

Here, the record belies a conclusion that the original erroneous instructions constitut-

ed plain error. In its first two attempts at charging the jury, the trial court instructed the jury that a dangerous weapon was "anything designed as a weapon and is known to be capable of producing death or great bodily harm." Neither time did the defense object to this instruction. It is difficult to determine from the record of this case if the defense's silence in the face of the erroneous instructions was a tactical decision or just error. The nature of the erroneous instruction certainly suggests that the defense may have had a motive not to object at trial. Perhaps there was no objection because the defense realized that the bottle thrown by appellant was not "designed as a weapon" and therefore would not fit within the instruction. Yet, despite having never raised the issue at trial, on appeal, the same public defender's office that represented appellant at trial claims that the erroneous instructions constitute reversible error. The majority opinion, without giving any reasons for doing so, gives the benefit of the doubt to the appellant. However, the clear mandate of our plain error analysis requires us to place a "heavy burden" on an appellant who failed to object to a claimed error at trial. Under the facts presented on the record, appellant has not met that burden.

Moreover, the trial court effectively cured any prejudicial effects these earlier instructions may have otherwise had by giving a proper instruction. The record suggests that the jury itself recognized the error in that the original instructions did not conform to the statutory language or the facts of the case before them. The jury therefore asked for clarification of the term dangerous weapon. In response, the trial court, with the consent of both parties, specifically instructed the jury that they had been given an incorrect instruction as to the definition of dangerous weapon and then gave the jury the definition of dangerous weapon set forth in CRIMJIG 13.06.[1] Contrary to the doubt

---

1. As the majority notes, the definition of dangerous weapon in CRIMJIG 13.06 differs from that in Minn.Stat. § 609.02, subd. 6. Yet, despite the disparity in the language, both parties conceded at trial and on appeal that the CRIMJIG definition was proper. Indeed, while there may be some argument that the different language carries different meanings, the advisory committee's

1990 comments to CRIMJIG 13.06 make it clear that the difference is purposeful. The language of CRIMJIG 13.06 originally mirrored the statutory definition of dangerous weapon. That definition, however, was challenged for being unconstitutionally vague. *See State v. Graham*, 366 N.W.2d 335, 337 (Minn.App.1985); *State v. Jen-*

expressed by the majority about the jury's capacity to resolve erroneous instructions, the very fact that it was the jury that requested a clarification of the erroneous instructions suggests that the jury had not been confused by the errors. Instead, the jury was keenly aware of the critical elements of the case. It seems highly unlikely that once it asked for the corrected definition the jury would not then apply that definition to the case before it.

Importantly, there is nothing inherent in the jury's verdict to indicate that giving a correct instruction did not cure the errors. When used as a club or a projectile, a glass bottle can be an effective weapon. Here, the record indicates that appellant intentionally and repeatedly threw bottles at another person with great force and at close range, resulting in serious bodily harm to that person. Given such evidence, the mere fact that the jury convicted appellant of second-degree assault after receiving the correct instructions does not, in and of itself, cast any doubt on the jury's understanding of the elements of the crime. Accordingly, I would affirm appellant's conviction and his sentence of 21 months, which, I also note, was a downward durational departure from the presumptive 30–month sentence provided for by the sentencing guidelines.

LANCASTER, Justice (dissenting).

I join the dissent of Justice Gilbert.

*sen,* 373 N.W.2d 364, 365–66 (Minn.App.1985) *pet. for rev. denied* (Minn. Oct. 11, 1985). While the courts upheld the constitutionality of the statutory definition, they were concerned that the statute's use of the term "likely" could improperly be interpreted to dilute the state's burden of proof. *Graham,* 366 N.W.2d at 337–38. In response, CRIMJIG 13.06 was amended and its language changed to clarify the state's high burden. *See* CRIMJIG 13.06, cmts. (1990).