STATE OF MINNESOTA

IN SUPREME COURT

A22-1551

Court of Appeals                                                McKeig, J.

State of Minnesota,

          Respondent,

vs.                                                  Filed: January 24, 2024
                                                     Office of Appellate Courts
Ayyoob Dawood Abdus-Salam,

          Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Anna R. Light, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.

Drake D. Metzger, Metzger Law Firm, LLC, Minneapolis, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The term "likely" as used in the manner-of-use definition for "dangerous weapon" under Minn. Stat. § 609.02, subd. 6 (2022), is unambiguous and means "probable or reasonably expected."

2.      The district court erred when it dismissed two second-degree riot charges for lack of probable cause because sufficient facts in the record precluded granting a motion for a judgment of acquittal if proved at trial.

Affirmed.

1

McKEIG, Justice.

This appeal requires us to interpret the statutory definition of "dangerous weapon" in Minn. Stat. § 609.02, subd. 6 (2022), a portion of which allows an ordinary object to be considered a dangerous weapon based on the way in which the object is used. The State of Minnesota charged Ayyoob Dawood Abdus-Salam with two counts of second-degree riot for his alleged organization of two intersection "takeovers." The commission of second-degree riot occurs when, among other elements, a person is armed with a dangerous weapon during the riot or knows another participant in the riot is armed with a dangerous weapon. Minn. Stat. § 609.71, subd. 2 (2022). The State argues that the vehicles used in the "takeovers" were transformed into dangerous weapons because of the way in which those vehicles were used. The district court dismissed the charges for lack of probable cause that the vehicles were dangerous weapons. The court of appeals reversed, finding that the State alleged sufficient facts to show probable cause. We agree. Because a reasonable jury could conclude from the facts alleged by the State that the vehicles used in the "takeovers" were dangerous weapons, we affirm.

**FACTS**

In April 2022 two intersection "takeovers" occurred in Hennepin County, alleged to have been organized and promoted by Abdus-Salam. During these "takeovers," dozens of vehicles and large crowds of pedestrians intentionally blocked off a predetermined urban intersection, which allowed drivers—typically driving rear-wheel-drive passenger cars—

2

to spin "donuts"[1] while the crowd cheered and filmed the action from both inside and outside the circle of the "donut." This type of driving is referred to by participants as "spinning." Other participants in these "takeovers" hung out the windows of the vehicles while the "spinning" occurred, often with most of their bodies outside the vehicles. Despite the evident danger, the record contains no evidence of death or reported injury resulting from this behavior. That said, one of the videos presented as evidence of probable cause shows an unidentified spectator being struck in the legs by the back of a silver Dodge Charger. In the video, the car flips the spectator upside-down and rotates him around through the air, causing him to land on his back and possibly strike his head. The spectator then crawls away.

Abdus-Salam was charged with second-degree riot under Minn. Stat. § 609.71, subd. 2 in connection with the earlier "takeover." In a separate prosecution, he was charged with second-degree riot in connection with the later "takeover." A probable cause challenge was filed in both cases, claiming that the State failed to present evidence showing that the manner in which the vehicles were used at the "takeovers" made them dangerous weapons. *See* Minn. Stat. § 609.02, subd. 6 (defining a dangerous weapon as any "device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm"). The district court granted Abdus-Salam's motions, concluding that probable cause did not exist for the dangerous weapon element

---

[1] "Donuts," also referred to as "spinning," are accomplished when a driver accelerates quickly to loosen the grip of the rear tires on the ground, allowing the car to drift in a loosely controlled circle. When doing a "donut," the tires will ideally never gain complete traction on the ground, causing squealing and smoking from the burnt rubber of the tires.

of the offenses because there was no evidence that the vehicles were used in a manner calculated to produce death or great bodily harm.

The State appealed, arguing that the district court erred by only analyzing one-half of the two parts of the manner-of-use definition for a dangerous weapon—analyzing the "calculated" part but not addressing whether the vehicles were "likely to produce death or great bodily harm." The court of appeals reversed, reasoning that courts "do not apply the phrase 'manner of use' so narrowly" as to only consider "the act of spinning and doing donuts," but also "consider the anticipated close proximity between cars and onlookers," and that "the state alleged sufficient facts from which a reasonable jury could conclude that the cars . . . were dangerous weapons." *State v. Abdus-Salam*, 988 N.W.2d 493, 499, 502 (Minn. App. 2023). We granted Abdus-Salam's petition for further review.

**ANALYSIS**

This case presents two interrelated questions: 1) what does "likely" mean in the context of the manner-of-use statutory definition for a dangerous weapon; and 2) did the district court err when dismissing the criminal complaints for lack of probable cause?

I.

We first address the issue of the statutory definition of "dangerous weapon" in the context of its manner-of-use. This is a question of statutory interpretation, which is reviewed de novo. *State v. Velisek*, 986 N.W.2d 696, 699 (Minn. 2023).

Under Minnesota's criminal code, "dangerous weapon" means:

> [A]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, any combustible or flammable liquid or *other device or instrumentality that, in*

4

*the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm*, or any fire that is used to produce death or great bodily harm.

Minn. Stat. § 609.02, subd. 6 (emphasis added). At issue is the italicized language, which we refer to as the manner-of-use definition of a dangerous weapon. Under this definition, an everyday object not traditionally considered a weapon may nevertheless become a dangerous weapon if the object is used in a manner calculated or likely to produce death or great bodily harm.[2]

The district court analyzed whether the vehicles used in the "takeovers" had been driven in a way calculated to cause death or great bodily harm and found that they had not, and the State does not claim that the district court erred in this analysis. But the State argued that the district court erred by not analyzing whether the vehicles were *likely* to cause the requisite harm in the manner in which they were used. The court of appeals applied a definition of "likely" that it concluded was taken from case law, including our decision in *State v. Gebremariam*, 590 N.W.2d 781, 783 (Minn. 1999) (plurality opinion). *Abdus-Salam*, 988 N.W.2d at 499. We initially consider if we have defined "likely" in this context, and if not, we must determine the appropriate definition.

A.

We first ask whether we have defined "likely" in the manner-of-use definition of a dangerous weapon. In *Gebremariam*, 590 N.W.2d at 783 (plurality opinion), we

---

[2]     "Great bodily harm" is defined as "bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm." Minn. Stat. § 609.02, subd. 8 (2022).

considered whether a defendant convicted of second-degree assault was entitled to a new trial because the district court erroneously instructed the jury. But the error we identified in the district court's first and second set of instructions did not focus upon the phrase "calculated or likely to produce death or great bodily harm." Instead, we emphasized that "[t]he court's first and second instructed definitions referring to a dangerous weapon as 'anything designed as a weapon' surely would have significantly misled the jury as to the instrumentality."[3] *Id.* at 784. We also stressed that "the court's first instructions on great bodily harm omitted a major category of the physical injury consequences of using a dangerous weapon."[4] *Id.* We determined that the interests of justice dictated a new trial due to the prejudicial impact of the first and second set of incorrect jury instructions—a conclusion reached by the majority of the court. *See Gebremariam*, 590 N.W.2d at 784 (plurality opinion); *see also id.* at 785 (Anderson, J., concurring specially).

Our holding did not rest upon the third set of instructions to the jury, in which the district court instructed the jury on the manner-of-use definition of dangerous weapon but replaced the statutory "calculated or likely to produce" with "known to be capable of producing." *Id.* at 783; *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 13.06 (3rd ed. 1998) ("A dangerous weapon is . . .

---

[3]    The district court erroneously defined dangerous weapon in its first and second set of jury instructions by telling the jury: " '[a] dangerous weapon is anything designed as a weapon and is known to be capable of producing great bodily harm.' " *Gebremariam*, 590 N.W.2d at 783 (plurality opinion).

[4]    The district court's first set of instructions erroneously defined "great bodily harm" by omitting part of the definition of that phrase. *Gebremariam*, 590 N.W.2d at 783 (plurality opinion).

6

anything else which, in the manner it is used or intended to be used, is known to be capable of producing death or great bodily harm.").  We noted the variance between the statutory definition of dangerous weapon and the jury instructions but found that the jury was "accurately instructed on the elements of the charged offense." *Gebremariam*, 590 N.W.2d at 783 n.1, 784 (plurality opinion).  Neither party in *Gebremariam* challenged the accuracy of the "known to be capable of" portion of the instructions, so we did not thoroughly dissect the language.  *Id.* at 784 (observing that "there is no contention at this point that the third set of instructions was not error-free"); *id.* at 786 n.1 (Gilbert, J., dissenting) (stating that "both parties conceded at trial and on appeal that the CRIMJIG definition was proper").  As a result, we did not apply our "judicial mind" and determine that "known to be capable of" was synonymous with "likely."  *In re Hope Coalition*, 977 N.W.2d 651, 660 (Minn. 2022) (citation omitted) (internal quotation marks omitted) (concluding prior cases had not actually decided an issue when they made a statement "without analysis").  Instead, we concluded that "[r]egardless of whether the errors [in the first and second set of instructions] favor one party or the other, we have grave doubts that after the fundamentally incorrect definition of the basic elements of the charged crime—"dangerous weapon" and "great bodily harm"—a third definition, *even if correct*, could sufficiently inform the jury as to the charged offense or assure a fair verdict under the circumstances here."[5] *Gebremariam*, 590 N.W.2d at 784 (plurality opinion) (emphasis added).

---

[5]    Because our analysis of the third set of jury instructions had no bearing on the outcome of *Gebremariam*, even if we had endorsed a definition of "likely," such an endorsement would have been obiter dicta and not binding.  *See Wandersee v. Brellenthin*

Moreover, we decline to now hold that "likely" means "known to be capable of." Abdus-Salam accurately claims that if "likely" meant "known to be capable of," the State's burden would be diluted when attempting to prove an ordinary object had been used as a dangerous weapon. Because dictionaries uniformly define "likely" as having at least a better chance of occurring than not, *see* discussion *infra* Section I.B, using the phrase "known to be capable of" arguably creates a lower threshold for the State to meet when asserting that a device or instrumentality is a "dangerous weapon." For example, the simple act of driving a car is "known to be capable of" injuring or killing someone, but that does not make injury or death "likely" to result from driving a car.

B.

We must then determine what "likely" *does* mean in the context of the manner-of-use definition of a dangerous weapon. The object of statutory interpretation is "to effectuate the intent of the Legislature." *State v. Powers*, 962 N.W.2d 853, 858 (Minn. 2021) (citing Minn. Stat. § 645.16 (2020)). The first step is to determine whether the statute's language is ambiguous. *State v. Loveless*, 987 N.W.2d 224, 250 (Minn. 2023). Statutory language is ambiguous if it is subject to more than one reasonable interpretation. *State v. Culver*, 941 N.W.2d 134, 139 (Minn. 2020). When the statutory language has only one reasonable interpretation, it is unambiguous, and we apply its plain meaning. *Id.*

*Chevrolet Co.,* 102 N.W.2d 514, 520 (Minn. 1960) ("Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved or essential to determination of the case in hand constitute obiter dicta and lack the force of adjudication." (citation omitted) (internal quotation marks omitted)).

Abdus-Salam contends that the definition of "likely" is "highly probable," whereas the State argues that it means something less than or equal to probable. Both interpretations find some support in dictionary definitions, though that does not necessarily require a finding of ambiguity. *See Goodman v. Best Buy, Inc.*, 777 N.W.2d 755, 759 n.3 (Minn. 2010) ("We see no discrepancy between noting that statutory language may at first glance have more than one meaning, and later drawing the conclusion that the language has one clear meaning after analyzing the various potential interpretations.").

When a statute does not define terms, we may look to the dictionary definition of those words to determine if a statute has a plain, unambiguous meaning. *Fordyce v. State*, 994 N.W.2d 893, 897 (Minn. 2023). Dictionary definitions of "likely" range on a spectrum of how probable an outcome must be. At the near-certain end of probability, "likely" is defined as "having a high probability of occurring or being true; very probable." *Merriam Webster's Collegiate Dictionary* 721 (11th ed. 2003). Supporting the low end of probability is a definition of "having a better chance of existing or occurring than not." *Webster's Third New International Dictionary* 1310 (2002). However, these definitions both seem to be outliers, as nearly every definition equates "likely" with an unqualified "probable" or "reasonably expected." *See, e.g., Black's Law Dictionary* 1113 (11th ed. 2019) (defining "likely" as "[a]pparently true or real; probable" and "[s]howing a strong tendency; reasonably expected"); *The American Heritage Dictionary of the English Language* 1017 (5th ed. 2018) (defining "likely" as "[p]ossessing or displaying the qualities or characteristics that make something probable"); *Funk and Wagnalls New Standard Dictionary of the English Language* 1434 (1945) (defining "likely" as

9

"probable," and "[r]easonably expected; showing a tendency; liable; apt"); *New Oxford American Dictionary* 1012 (3rd ed. 2010) (defining "likely" as "such as well might happen or be true; probable").

Other than a single dictionary definition, neither party offers convincing support concerning the structure or context of the statute that the Legislature intended to adopt a definition on one end of the spectrum of probability or the other—and we find no other indication of ambiguity. Presumably, one could reasonably expect the Legislature to have qualified the term "likely" if it intended a higher or lower threshold of probability. *See Buzzell v. Walz*, 974 N.W.2d 256, 264 (Minn. 2022) (rejecting a strained interpretation of a statute by reasoning that, had the Legislature intended such an interpretation, "one would reasonably expect" it to have included the critical words in the text of the statute). Therefore, consistent with its plain meaning, we hold that "likely" means "probable or reasonably expected" in the context of the manner-of-use definition of a dangerous weapon.

II.

With that definition in mind, we turn to whether the district court erred when dismissing Abdus-Salam's charges for second-degree riot for lack of probable cause. We review "factual findings underlying a probable cause determination using the clear error standard, but review the district court's application of the legal standard of probable cause to those facts de novo." *State v. Lopez*, 778 N.W.2d 700, 703 (Minn. 2010).

To convict someone of second-degree riot, the State must prove: 1) the defendant was one of three or more persons assembled; 2) those assembled disturbed the public peace

10

with an intentional act or threat of unlawful force or violence to person or property; and 3) the defendant was, or knew another participant to be, armed with a dangerous weapon. Minn. Stat. § 609.71, subd. 2.

Here, the district court found probable cause for the first two elements, but when analyzing the third element—whether the vehicles were dangerous weapons based on manner-of-use—it found no probable cause. When determining there was no probable cause that the vehicles were dangerous weapons, the court found the vehicles "were not used in a manner calculated to cause great bodily harm" because no evidence suggested they were intentionally driven toward anyone. This conclusion was based on the premise that, for an ordinary object to be transformed into a dangerous weapon, "an object must not [just] be dangerous, it must also be used in a manner calculated to cause great bodily harm."

But the district court's findings ignore half of the manner-of-use definition of "dangerous weapon"—that it is "calculated *or likely* to produce death or great bodily harm." Minn. Stat .§ 609.02, subd. 6 (emphasis added). If the Legislature unambiguously uses the word "or," we read the term " 'in the disjunctive and require that only one of the possible factual situations be present in order for the statute to be satisfied.' " *Munger v. State*, 749 N.W.2d 335, 338 (Minn. 2008) (quoting *State v. Loge,* 608 N.W.2d 152, 155 (Minn. 2000)). We also "favor an interpretation that gives each word or phrase in a statute a distinct, not an identical, meaning." *State v. Friese*, 959 N.W.2d 205, 210 (Minn. 2021) (citation omitted) (internal quotation marks omitted). Here, no ambiguity surrounds the "or" in the phrase "calculated or likely to produce," so "calculated" and "likely" have distinct meanings. Therefore, only one correlating factual situation is required to transform

11

an ordinary object into a dangerous weapon—whether the object was used in a manner 1) calculated to produce death or great bodily harm; *or* 2) likely to produce death or great bodily harm. Although the district court's order mentioned the "calculated or likely to" standard, it is clear from the discussion that the court did not analyze the "likely" prong.

Putting the definition of "likely" to work, we must determine whether the State offered sufficient evidence to show probable cause that death or great bodily harm was a probable or reasonably expected result of the "spinning" vehicles' manner-of-use. Abdus-Salam produced no witnesses and offered no evidence to challenge the credibility of the facts on the record in this case. "[U]nder these circumstances, a district court should deny a motion to dismiss the charge for lack of probable cause if it is 'satisfied that the facts appearing in the record, including reliable hearsay, would preclude the granting of a motion for a [judgment] of acquittal if proved at trial.' " *State v. Dixon*, 981 N.W.2d 387, 392–93 (Minn. 2022) (quoting *State v. Florence*, 239 N.W.2d 892, 903 (1976)). In addition to the facts alleged in the complaint, the State submitted two videos of State Patrol helicopter surveillance—one from each "takeover" Abdus-Salam is alleged to have organized—and two YouTube videos that show footage from those "takeovers." In the videos, the "spinning" cars are shown with people hanging off the outside of the vehicles while surrounded by onlookers standing in close proximity both inside and outside the circle of the "donut." One video even shows a person being struck hard enough by a participating vehicle to flip him up into the air and onto his back—with no indication that the driver intended to do so, but no clear sign that the spectator was uninjured.

12

"When determining whether an object, even an inherently dangerous object, is a dangerous weapon, the court must examine not only the nature of the object itself, but also the manner in which it was used." *State v. Basting*, 572 N.W.2d 281, 285 (Minn. 1997). A reasonable juror could conclude that death or great bodily harm is a probable or reasonably expected result when a vehicle spins "donuts" mere inches from dozens of excited onlookers. The facts in the record could support a jury finding that the vehicles were likely to produce death or great bodily harm based on the manner in which they were being used. As a result, the district court erred when it granted Abdus-Salam's pretrial motion to dismiss the two second-degree riot charges for lack of probable cause.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.