STATE of Minnesota, Respondent,

v.

Diane Marcella HARTMANN, et al., Appellants.

No. A03–1674.

Supreme Court of Minnesota.

July 28, 2005.

450

Gary K. Woods, Advocacy Alliance PA, Minneapolis, MN, for Appellants.

Mike Hatch, Attorney General, St. Paul, MN, Michael K. Junge, McLeod County Attorney, Mark Metz, Asst. McLeod County Attorney, Glencoe, MN, for Respondent.

## OPINION

MEYER, Justice.

Appellants Diane and Michael Hartmann appeal their convictions of failure to obtain a license to sell meat under Minn. Stat. § 28A.04 (2004) and unauthorized sale of custom-processed meat under Minn.Stat. § 31A.10(4) (2004).[1] Before the district court and the court of appeals, the Hartmanns argued that their conduct was statutorily exempt from prosecution and also protected by Article XIII, Section 7, of the Minnesota Constitution. Both lower courts concluded that the Hartmanns' conduct was neither statutorily nor constitutionally exempt from prosecution. We affirm in part and reverse in part.

The Hartmanns own a small organic farm in rural Gibbon, Minnesota, where they raise crops and animals. The cows and hogs raised on the farm by the Hartmanns were custom-processed by Lafayette City Meats in Lafayette, Minnesota. The processed meat was then returned to the Hartmanns, who sold the meat directly to consumers from their van at a residence

---

1. Custom processing is defined as "slaughtering, eviscerating, dressing, or processing an animal or processing meat products * * * for the owner of the animal or of the meat products * * * if all meat products * * * derived from the custom operation are returned to the owner of the animal or of the meat products * * *." Minn.Stat. § 31A.02, subd. 5 (2004).

in Hutchinson, Minnesota. In April 2001, the state began an investigation into the Hartmanns' meat-selling practices after it received information that they were selling uninspected meat. The state performed surveillance on their activities and on two separate occasions agents of the Department of Agriculture purchased from the Hartmanns small quantities of custom-processed ground beef, wieners, pork chops, beef liver, and bacon. On December 7, 2001, Minnesota Department of Agriculture compliance officer Theresa Chirhart picked up an order of meat from Diane Hartmann outside a van in Hutchinson. After the sale, Chirhart issued Diane Hartmann the following: an order to stop the sale of food without a retail food handler's license; an order to stop the sale of custom-processed meat; copies of the Minnesota statutes that were the subject of the orders; and a written report. In response, the Hartmanns sent a letter requesting the state's interpretation of a number of state constitutional and statutory provisions and informing the state that if it failed to respond, the Hartmanns would consider the state in agreement with their interpretation. The state did not respond to this letter.

On March 8, 2002, the state filed criminal complaints against the Hartmanns, charging each of them with one count of failure to obtain a license in violation of Minn.Stat. § 28A.04, and one count of unauthorized sale of custom-processed meat in violation of Minn.Stat. § 31A.10(4). The complaints were mailed to the Hartmanns at a street address, but were returned to the district court because the Hartmanns had no mail receptacle. No further attempt was made to notify the Hartmanns of the complaint against them.

The case was submitted to the district court on stipulated facts, and the Hartmanns were convicted on both counts.

The court of appeals affirmed the convictions, *State v. Hartmann*, 681 N.W.2d 690, 693 (Minn.App.2004), and we granted review.

## I.

■ The Hartmanns were found guilty of selling their meat products without a license under the Minnesota Consolidated Food Licensing Law, which states: "No person shall engage in the business of manufacturing, processing, selling, handling, or storing food without having first obtained from the commissioner a license for doing such business." Minn.Stat. § 28A.04, subd. 1 (2004). The Hartmanns claim that they are exempt from this licensing requirement by Minn.Stat. § 28A.15, subds. 1–2 (2004), which provides in pertinent part:

The licensing provisions of sections 28A.01 to 28A.16 shall not apply to the following:

* * * Persons selling the products of the farm or garden occupied and cultivated by them, or to persons not regularly engaged in the business of manufacturing and selling food and who prepare food only on order of and for sale directly to the ultimate consumer, or to educational, charitable or religious organizations not regularly engaged in the business of manufacturing, processing, or selling food at their established educational, charitable or religious institutions.

The language of the first clause of this exclusion is nearly identical to language in the Minnesota Constitution, which provides: "Any person may sell or peddle the products of the farm or garden occupied and cultivated by him without obtaining a license therefor." Minn. Const. art. XIII, § 7. The Hartmanns argue that because the statutory exclusion includes nearly identical language to the Minnesota Con-

stitution, they are constitutionally protected from the licensure requirement.

■ Several principles of construction guide our analysis of this issue. When examining constitutional provisions, we "give effect to the clear, explicit, unambiguous and ordinary meaning of the language." *Rice v. Connolly*, 488 N.W.2d 241, 247 (Minn.1992) (construing the meaning of the words "on-track betting" to determine that telephone wagering and teleracing were not allowable forms of betting under the Minnesota Constitution because they take place away from the track); *State ex rel. Gardner v. Holm*, 241 Minn: 125, 129, 62 N.W.2d 52, 55 (1954). We will not "substitute for words used in the constitution having a well-defined meaning other words having a different meaning." *State v. Pett*, 253 Minn. 429, 432, 92 N.W.2d 205, 207 (1958) (holding that the phrase "capital offenses" has a clear and well-defined meaning, which is "crimes punishable by death," and that interpreting it to mean only first-degree murder would constitute a de facto amendment to the Minnesota Constitution, and would be an impermissible act by this court). When considering the ordinary meaning of the words of a constitutional provision, we must construe them "in the light of the social, economic, and political situation of the people at the time of its adoption, as well as subsequent changes in such conditions." *Rice*, 488 N.W.2d at 247 (quoting *State ex rel. Chase v. Babcock*, 175 Minn. 103, 107, 220 N.W. 408, 410 (1928)).

■ The state contends, and the court of appeals held, that article XIII, section 7, simply provides that people may sell without a license "cultivated products of the farm" and cultivated products can mean only fruits and vegetables. *Hartmann*, 681 N.W.2d at 695. The court of appeals concluded that because meat is not "cultivated" it can never be sold without a license.[2] We do not agree with this reading of article XIII, section 7. The language of the provision extends its protection to all products; the only limitation is that the farm or garden must be occupied and cultivated by the seller. This is evidenced by the conjunctive use of "occupied and cultivated"—a product cannot be both occupied and cultivated, but a farm or garden can. Therefore, we conclude that article XIII, section 7, provides that people may sell without a license the product of a farm or garden so long as the farm or garden is occupied and cultivated by the seller.

The state next argues that even if "products of the farm" are not restricted to fruit and vegetable products, "products" does not include processed meat because meat is no longer in its raw or natural state. The state asserts that once a raw farm product is altered in any way, it no longer qualifies as a product of the farm or garden. Thus, berries, cream, and live pigs are products of the farm, but preserves, butter or cheese, and ham are not. In other words, the state would substitute the words "raw or natural products" for the word "products." The state offers no authority to support its position, asserting only that any other conclusion would jeopardize the well-being of the public.[3]

We consider whether "product" has a well-defined and clear meaning. *Webster's Dictionary* defines "product" as "a thing produced by labor" and a "thing produced

---

**2.** The court of appeals also held that article XIII, section 7, only protected the activity of peddling. *Hartmann*, 681 N.W.2d at 694–95. The state now concedes that this is an erroneous reading of the constitutional provision and that both peddling and selling activities are protected. We agree.

**3.** The court of appeals did not rule on this issue.

by or resulting from a process, as a natural, social, or historical one." *Random House Webster's Unabridged Dictionary* 1544 (2d ed.2001). *Black's* defines "product" as: "Something that is distributed commercially for use or consumption and that is usu. (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption." *Black's Law Dictionary* 1245 (8th ed.2004). Neither of these sources suggests that a product is limited to unprocessed things. To the contrary, both definitions recognize processing as incidental to the making of a product. These dictionary definitions support the generally accepted notion that meat, cheese, and butter are products of the farm.

An opinion of the attorney general from 1939 expressed the view that "meat from animals * * * raised on land occupied by a farmer would be interpreted as 'products of the farm or garden' within the meaning of [article XIII, section 7]." Op. Att'y Gen. No. 213 (Dec. 7, 1939). In that opinion, the attorney general cited a case from the District of Columbia, which stated:

> [T]he common practice of the country, has been to consider all those things as farming products or agricultural products which had the situs of their production upon the farm, and which were brought into condition for the uses of society by the labor of those engaged in agricultural pursuits, as contra-distinguished from manufacturing or other industrial pursuits.

*Id.* The attorney general's opinion, while not binding, is persuasive authority for the proposition that "products of the farm" was understood to include meat, at a time close to the adoption of Minn. Const. art. XIII, § 7. Since we must use the ordinary meaning of constitutional words or phrases in light of the social, economic, and political situation of the people at the time the provision was adopted, we consider documents providing insight into these factors highly persuasive.

The state argues that the Hartmanns' product is the animal sent to the butcher, but that the end product, the meat, is a product of the butcher's effort and not the Hartmanns'. The state's argument would have some merit if the butcher were selling the meat, rather than returning it to the Hartmanns, or if the butcher delivered to the Hartmanns a certain quantity of meat that the butcher had processed from all the animals it received from various farmers. But, the parties stipulate here that the butcher processed the Hartmanns' animals individually and kept the finished products separate, ensuring that the Hartmanns received their own animals as processed meat. Thus, the butcher performed one step in creating the final product sold by the Hartmanns, but it cannot accurately be said that the end product was the butcher's.

The common understanding and dictionary definitions of the word "product," and the attorney general's opinion from 1939, lead us to conclude that a product of the farm under article XIII, section 7, may be a processed item and need not be in its "raw or natural" state. Meat is generally understood to be a product of the farm; therefore, we conclude that meat that has been raised on a farm occupied and cultivated by the seller and then processed and returned to the seller is a "product" and may be sold without a license under article XIII, section 7.

■ We do not believe, however, that article XIII, section 7, can reasonably be read to grant farmers the right to sell products of the farm, the growing or sale of which is otherwise prohibited by law. This provision merely provides that prod-

ucts of the farm *for which any person may obtain a sales license; i.e., lawful products,* may be sold by farmers without obtaining a license to do so. A license is "formal permission from a governmental or other constituted authority to do something, as to carry on some business or profession." *Webster's, supra,* 1109. Being relieved of the need to obtain a license therefore allows farmers to sell the products of their farm without obtaining the government's permission. That is not to say that article XIII, section 7, protects farmers from any government regulation of the production of farm products for sale. To regulate is to control or direct by a rule. In other words, we read article XIII, section 7, to exempt farmers from licensure to sell products but not from substantive regulation of the production or sale of their farm products.

The following history of the adoption of Minn. Const. art. XIII, § 7, supports this reading. In 1904, this court decided *State v. Jensen,* 93 Minn. 88, 100 N.W. 644 (1904). In *Jensen,* a peddler was convicted of selling melons from his wagon along the streets of Minneapolis without having obtained a license to peddle. *Id.* at 88–90, 100 N.W. at 644–45. The defendant argued that he was not a peddler, but was a farmer selling his own goods, and therefore he should not be subject to the peddler's licensing requirement.[4] *Id.* at 90, 100 N.W. at 645. This court affirmed his conviction, stating:

> [T]he fact that the articles sold from house to house are the products of the seller's own farm or garden offers no just reason why he should not be placed on the same basis as parties who pur-

chase their stock from others. * * * There can be no distinction in principle between the party who peddles his own product, and the one who buys his stock from the producer, and peddles it, and we cannot recognize any such distinction.

*Id.* at 91, 100 N.W. at 645. The legislature reacted to the *Jensen* case by proposing an amendment to the Minnesota Constitution, which was heartily ratified by the voters of Minnesota in 1906[5] and is now codified at article XIII, section 7. William Anderson, *A History of the Constitution of Minnesota* 157 (1921).

The circumstances leading up to the passage of article XIII, section 7, make clear that the voters of Minnesota intended to protect the commercial relationship between farmers and their customers by restricting the state's power to license the sale of farm products directly to the consumer. This view is supported by this court's observation in a 1925 case that article XIII, section 7, gives "recognition [ ] to the fact that tillers of the soil stand in a peculiar position in reference to the marketing of their products, and it prohibits the imposition of a license to sell or peddle the same." *Minnesota Wheat Growers' Co-op. Marketing Ass'n v. Huggins,* 162 Minn. 471, 480, 203 N.W. 420, 424 (1925).

We hold that article XIII, section 7, grants farmers the right to sell products of the farm or garden that they are not otherwise legally prohibited from selling, without obtaining a license. The language of article XIII, section 7, is broad and clear. Defining "products of the farm" to include any farmer's product for which a

---

4. The license cost $125, which represented nearly 50% of the average farmer's annual income in 1900. *See American History: Agriculture,* http://www.answers.com/topic/agriculture.

5. The amendment received 190,897 votes in favor and 34,094 in opposition, out of a total of 284,366 votes. William Anderson, *A History of the Constitution of Minnesota* 157 (1921).

license may issue gives effect to the "clear, explicit, unambiguous and ordinary meaning of the language" and honors the intent of the Minnesota voters who ratified Minn. Const. art. XIII, § 7. Therefore, the Hartmanns may not be prosecuted for failure to obtain a license to sell meat products of their farm.

## II.

■ The Hartmanns also challenge their convictions for selling custom-processed meat in violation of Minn.Stat. § 31A.10(4), which is part of the Minnesota Meat and Poultry Inspection Act.[6] The Hartmanns challenge this conviction on two grounds. First, they contend that the statutory prohibition on sale of custom-processed meat violates their right to sell the products of their farm protected by Article XIII, Section 7, of the Minnesota Constitution. Second, they argue that Minn.Stat. § 31A.15, subd. 1(1) (2004), exempts them from the prohibition.

*Constitutional Claim*

■ The Hartmanns' constitutional argument based on article XIII, section 7, fails because the right to sell farm products without a license created by that provision is not as broad as they contend. As noted *supra*, the protection provided by article XIII, section 7, against licensing requirements does not exempt farmers

from substantive regulation related to the production or sale of their farm products. Therefore, although article XIII, section 7, exempts a farmer from obtaining a license to sell the products of his or her farm, the farmer is not free to ignore regulations imposed on the production of those products.[7] Similarly, if sale of a particular farm product is otherwise prohibited by law, article XIII, section 7, does not insulate farmers from that prohibition.

Sale of the product at issue here, custom-processed meat, is prohibited by statute. Minn.Stat. § 31A.10(4). The statutory regulation of custom-processed meat is but a small part of a much larger regulatory structure that governs the production and sale of food products in Minnesota for the protection of the public's health and safety. *See, e.g.*, Minn.Stat. chs. 28A (Licensing Food Handlers); 31 (Food); and 31A (Meat and Poultry Inspection) (2004). In general, processing of meat is governed by regulations that require licensing and inspection of processing facilities; *see* Minn.Stat. § 28A.04 (2004) (licensing), Minn.Stat. § 31.53 (2004) (inspection of slaughter houses), and Minn.Stat. §§ 31A.03 and 31A.04 (2004) (inspection of animals both before and after processing). Custom-processed meat is subject to less rigorous regulation, in that it is exempted from the requirements for inspection of

---

**6.** Section 31A.10(4) provides: "No person may, with respect to an animal, carcass, part of a carcass, * * * meat, or meat food product: * * * (4) sell, offer for sale, or possess with intent to sell meat derived from custom processing."

**7.** The distinction between pure licensing requirements and substantive regulation is also reflected, for example, in the legislature's Declaration of Policy in the Minnesota Consolidated Food Licensing Law:

It is hereby declared to be the policy of the legislature, recognizing that food in its various forms is essential to the health and

well-being of the people of this state and that its production, processing, packaging, labeling, handling, distribution and sale may create health hazards, misinform consumers, perpetuate frauds or otherwise jeopardize the public health and welfare * * * to require * * * that all producers, processors, packagers, labelers, handlers, distributors and vendors of food, *whether or not subject to licensing, shall be required to comply with all applicable rules adopted by the commissioner.*

Minn.Stat. § 28A.02 (2004) (emphasis added).

the animals pre- and post-slaughtering. Minn.Stat. § 31A.15, subd. 1(2). But the trade off for this exemption from these health and safety inspections is that custom-processed meat may not be sold. *See* Minn.Stat. § 31A.10(4).

Article XIII, section 7, does not exempt the Hartmanns from this health and safety regulation that prohibits the sale of uninspected meat. In other words, custom-processed meat is not a product that lawfully may be sold, and the fact that the Hartmanns are constitutionally protected from needing a license to sell lawful products of their farm does not legalize their sale of custom-processed meat. Accordingly, the Hartmanns' convictions for illegal sale of custom-processed meat did not violate their rights under article XIII, section 7.

 The Hartmanns do not make any other coherent constitutional claims with respect to the sale of custom-processed meat. They make a terse reference to a due process claim in their reply brief, in the section addressing their convictions for sale without a license, where they attempt to rebut respondent's argument that selling farm produce is not a fundamental right. However, neither the Hartmanns' petition for review to this court nor the statement of issues in their principal brief mentions the Due Process Clause, or any other constitutional provision besides article XIII, section 7; there is no argument regarding due process in the Hartmanns' principal brief; there is no discussion in either of their briefs of the legal standards applicable to a due process claim and no citation to authority with reference to due process. Vague references to the state's police power are not enough to invoke an unarticulated and unidentified constitutional protection. We have repeatedly held that failure to argue an issue in a party's brief constitutes waiver of that issue. *See, e.g., In re Application of Olson,* 648 N.W.2d 226, 228 (Minn.2002); *Koppinger v. City of Fairmont,* 311 Minn. 186, 189 n. 2, 248 N.W.2d 708, 711 n. 2 (1976). Although we have not defined in detail what constitutes failure to argue an issue, it should be clear that making only one cryptic reference to a constitutional provision in a reply brief, without any other express explanation, argument, or citation to relevant authority, is not sufficient. Accordingly, we must conclude that constitutional claims other than those based on article XIII, section 7, have been waived by the Hartmanns.[8]

*Statutory Exemption Claim*

 The Hartmanns also contend that Minn.Stat. § 31A.15, subd. 1(1), exempts them from the prohibition on the sale of custom-processed meat. Section 31A.15, subd. 1, provides:

> The provisions of sections 31A.01 to 31A.16 requiring inspection of the

---

8. The dissent concludes that the state failed to make a required showing that the statute prohibiting sale of custom-processed meat is rationally related to achievement of a legitimate governmental purpose, citing *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), and *Contos v. Herbst,* 278 N.W.2d 732 (Minn.1979). The state is required to make such a showing when a statute is challenged as a violation of equal protection, as in *Clover Leaf Creamery,* or substantive due process, as in *Contos.* But the Hartmanns have made no cognizable equal protection or due process challenge. Further, although we express no opinion on the issue because it was not properly raised by the Hartmanns, we note in response to the dissent's suggestion that there is no public health or safety rationale for treating the sale of custom-processed meat differently than the use of such meat in the owner's household, that it is not uncommon for governmental regulation at every level, federal, state, and local, to treat commercial activity differently than the same activity engaged in on a personal, noncommercial basis.

slaughter of animals and the preparation of the carcasses, parts of carcasses, meat, * * * and meat food products at establishments conducting slaughter and preparation do not apply:

(1) to the processing by a person of the person's own animals and the owner's preparation and transportation in intrastate commerce of the. * * * meat * * * of those animals exclusively for use by the owner and members of the owner's household, nonpaying guests, and employees; or

(2) to the custom processing by a person of cattle, sheep, swine, poultry or goats delivered by the owner for processing, and the preparation or transportation in intrastate commerce of the * * * meat * * * exclusively for use in the household of the owner by the owner and members of the owner's household, nonpaying guests, and employees.

The Hartmanns argue that the term "use" in the phrase "exclusively for use by the owner" in clause (1) is not defined and therefore can include the owner's sale of the processed meat.

The Hartmanns' reliance on the statutory exemption fails for several reasons. First, clause (1) of subdivision 1 does not apply to the Hartmanns' circumstances because clause (1) by its terms applies only to "the processing by a person of the person's own animals." *Id.* The Hartmanns did not process their own animals; they sent them to Lafayette City Meats for processing.

 In contrast, clause (2) by its terms applies to "custom processing by a person of [animals] delivered by the owner for processing." Minn.Stat. § 31A.15, subd. 1(2). Custom processing is defined as "slaughtering, [etc.] an animal or processing meat products * * * for the owner of the animal or of the meat products * * * if all meat products * * * derived from the custom operation are returned to the owner * * *." Minn.Stat. § 31A.02, subd. 5. Plainly, custom processing involves processing of the meat by someone other than the owner, with all of the product returned to the owner. Just as plainly, custom processing does not include processing of the meat by the owner himself. The exemption provided in clause (1) of section 31A.15, subdivision 1, applies to owner processing, whereas the exemption in clause (2) applies to custom processing. Because the Hartmanns' meat was custom-processed, they must look to clause (2) for any exemption.

However, one of the conditions of the clause (2) exemption is that meat must be "exclusively for use *in the household of the owner* by the owner and members of the owner's household, nonpaying guests, and employees." Minn.Stat. § 31A.15, subd. 1(2) (emphasis added). The precise language of this exemption "for use in the household of the owner" belies the Hartmanns' argument that the "use" allowed includes sale of the meat to others.[9]

An additional reason that the statutory exemption does not render the Hartmanns' conviction for unlawful sales invalid is that the exemption is only from the *inspection* provisions of the designated statutes. There is no reference at all in the exemption language to the prohibition against sale of custom-processed meat, and therefore no reason to conclude the exemption covers that activity.

9. . By noting the "in the household" phrase that is present in clause (2) and not in clause (1), we do not mean to suggest that "use" in clause (1) may therefore have the broad meaning attributed to it by the Hartmanns. Because clause (1) is inapplicable to the facts of this case, we express no opinion on the scope of that exemption.

For these reasons, the Hartmanns' constitutional and statutory challenges to their convictions of selling custom-processed meat in violation of Minn.Stat. § 31A.10(4) fail.

## III.

In their brief, the Hartmanns argued that the state's decision to prosecute them after failing to provide them with an administrative hearing is "objective evidence of vindictiveness." The Hartmanns also cited as further evidence of prosecutorial vindictiveness the state's failure to resend the complaint against the Hartmanns when it was returned undeliverable, despite having notice that the Hartmanns obtained their mail by general delivery from the Glencoe post office. But, the Hartmanns explicitly abandoned their prosecutorial vindictiveness claim at oral argument. Therefore, we do not reach the merits of this issue.

Affirmed in part and reversed in part.

ANDERSON, PAUL H., Justice (concurring).

I concur in the result reached by the majority and the reasons stated for that result. Nevertheless, I write separately to first acknowledge the attraction of certain aspects of the dissent's position and second, to explain why I believe it is inappropriate to reach the dissent's conclusion given the record in this case.

The dissent would have us hold that Minn.Stat. § 31A.10(4) is unconstitutional as applied to the Hartmanns. It may be possible to reach that conclusion, but, to reach it here, it is necessary to go outside of the parameters of the arguments made by the Hartmanns—a concern that has been articulated by the majority. Therefore, I believe the majority is exercising the proper degree of judicial restraint when it declines the dissent's invitation to expand the reach of this case by sua sponte declaring Minn.Stat. § 31A.10(4) unconstitutional.

The question of whether a statute is unconstitutional is one of "much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810).[1] We must always proceed on the assumption that a statute is constitutional and "we are required to place a construction on the statute that will find it so if at all possible." *Kline v. Berg Drywall, Inc.*, 685 N.W.2d 12, 23 (Minn.2004). We exercise our power to declare a statute unconstitutional "with extreme caution." *State v. Harris*, 667 N.W.2d 911, 919 (Minn.2003) (quoting *State v. Larsen*, 650 N.W.2d 144, 147 (Minn.2002)). "Due respect for the co-equal branches of government" requires us to exercise this restraint. *State v. McCoy*, 682 N.W.2d 153, 160 (Minn.2004) (quoting *State v. Willis*, 332 N.W.2d 180, 184 (Minn. 1983)).

When the basis for declaring a statute unconstitutional is not argued by the par-

1. See the comments of Chief Justice John Marshall in *Fletcher v. Peck*, where Chief Justice Marshall said:

> The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when compelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obli-

gations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.

10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810).

ties in either their briefs or at oral argument, it should be a very rare occasion where we proceed to consider the constitutionality of the statute on unargued and unarticulated grounds. *See Maytag Co. v. Comm'r of Taxation,* 218 Minn. 460, 462, 17 N.W.2d 37, 39 (1944) (declining to consider the constitutionality of a tax statute when the plaintiff did not argue the issue in its brief or at oral argument). We should not "anticipate a question of constitutional law in advance of the necessity of deciding it." *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (quoting *Liverpool N.Y. & Phila. S.S. Co. v. Emigration Comm'rs,* 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)) (Brandeis, J., concurring); *see also In re Senty–Haugen,* 583 N.W.2d 266, 269–70 n. 3 (Minn.1998) (declining to sua sponte declare a statute unconstitutional); Lisa A. Kloppenberg, *Avoiding Constitutional Questions,* 35 B.C. L.Rev. 1003 (1994).

Here, neither party specifically raises or argues the specific constitutional grounds that are necessary for the dissent to reach its conclusion that section 31A.10(4) is unconstitutional as applied to the Hartmanns. Without having those arguments presented to us and in the absence of any competing legal analysis of these arguments, I believe the dissent's conclusion is inappropriate. Therefore, I concur with the majority opinion.

ANDERSON, G. BARRY, Justice (dissenting).

I agree with the majority's conclusion that the clear and unambiguous language of Article XIII, Section 7, of the Minnesota Constitution permits any person to sell the products of his or her farm, including meat products, without obtaining a license. But because I also conclude that the majority opinion, by upholding the custom meat processing regulation in the context of the present dispute, guts the constitutional protections granted to farmers to sell their own products, I respectfully dissent.

We today declare, that it is "clear that the voters of Minnesota intended to protect the commercial relationship between farmers and their customers by restricting the state's power to license the sale of farm products directly to the consumer." This much the majority grants. The language of article XIII, section 7, the majority says, is "broad and clear." But then, by adopting a distinction between "pure licensing requirements and substantive regulation," the majority states that "[a]rticle XIII, section 7, does not exempt the Hartmanns from [Minn.Stat. § 31A.10(4)] that prohibits the sale of uninspected meat." The distinction the majority draws between licensure and substantive regulation is real, but it cannot be employed, without more, to circumvent constitutional provisions and the intent of the people of Minnesota.

There is no dispute that ensuring the safety of the food supply is a valid purpose of regulation, nor is it disputed that inspection is a valid means to that end. Food inspection has a long history in Minnesota—the first sanitary food law giving the Minnesota Dairy and Food Department (the precursor to the current Department of Agriculture) general inspection duties for food-related establishments was promulgated in 1913; state meat inspection, first enacted in 1969, is of more recent vintage. Act of March 6, 1913, ch. 47, 1913 Minn. Laws 41; Act of Apr. 29, 1969, ch. 225, 1969 Minn. Laws 338 (codified at Minn.Stat. ch. 31A. (2004)). What is disputed here is a provision of Minnesota law that permits the custom slaughtering and preparation of animals for use by the immediate family of the farmer. The state alleges, and the majority agrees, that because the statute does not permit sale of custom slaughtered animals by the farmer-owner, such sale is therefore illegal not-

withstanding the constitutional prohibition against a licensing requirement.

But in the present case, the state makes no showing that the small-scale sale of custom processed meats by livestock farmers presents a public health risk. Nor does the state attempt to justify the disparate treatment of custom processors of meat and farmers wishing to sell their meat directly to consumers. Custom processors may, without inspection, process and return meats to individual farmers for use by the farmer, his or her family and employees. Minn.Stat. § 31A.15, subd. 1(2) (2004).[1] Despite the fact that custom processors may return uninspected, processed meats to an unlimited number of qualifying persons for individual use, a farmer may not sell his own custom-processed meats to the public. *Id.* If the former does not present a public health risk, it is difficult to see how the latter does, especially considering the low volume of sales normally associated with sales by a single farmer. The state makes no showing that the Hartmanns' sale of the produce of their farm endangers public health any more than does the custom processing and return of uninspected meat for use by farmers, their families and employees. The majority merely notes without analysis that the prohibition of the sale of custom-processed meats is a "trade off" for exemption from inspections.

A word needs to be said about the underlying arguments offered by the parties. The basis of the state's argument is that custom processed meat is a threat to public health if offered for sale to the public. This is not illogical but it is unsupported by the statute and the record before us.

The legislature could speak clearly on this question, addressing when and where, consistent with public health, a farmer is permitted to sell processed meat that is the product of his or her farm. But this the legislature has not done.

Similarly, implicit in appellant's argument is the superiority of "organic" meat custom processed by the farmer for sale to the public. Not only is this not self-evident, but, here, too, there is nothing in this record to support such a conclusion. Indeed, it may very well prove that public health demands tight and burdensome regulation of custom processed meat before permitting, if at all, sale of a farmer's product to the general public.

As footnote four in the majority opinion implicitly demonstrates, the licensing requirement prohibited by Minnesota voters was so onerous (essentially a fee equivalent to nearly 50% of annual household income) as to be an indirect bar to the sale of farm products. The custom slaughter sale ban we consider here has virtually the same effect. I do not contend, and the Hartmanns do not argue, that the voters insulated farmers from public safety regulation. But where the Minnesota Constitution has protected the commercial relationship between a farmer and the farmer's customers, there needs to be at least some minimal showing that the regulation in question actually addresses public safety issues.[2] This is not a difficult burden to impose on the state; to hold otherwise, however, is to ignore the intent of the voters as expressed in article XIII, section 7, which recognized "the fact that tillers of the soil stand in a peculiar position in reference to the marketing of their prod-

---

1. The underlying assumption in this litigation is that the only vehicle available for the Hartmanns to sell directly to the public their own organically raised animal products is by way of the custom processing provisions found at Minn.Stat. § 314A.10(4). In any event, neither party cites any authority for the proposi-

tion that the Hartmanns had other options available that would avoid the constitutional interpretation issue presented here.

2. Given the absence of litigation in connection with Article XIII, Section 7, of the Minne-

ucts," *Minnesota Wheat Growers' Co-op. Marketing Assn. v. Huggins,* 162 Minn. 471, 480, 203 N.W. 420, 424 (1925).[3] Because I conclude that the prohibition on the sale of custom processed meat found in section 31A.10(4) is unconstitutional as applied to the Hartmanns, I respectfully dissent.

BLATZ, Chief Justice (dissenting).

I join in the dissent of Justice G. Barry Anderson.

PAGE, Justice (dissenting).

I join in the dissent of Justice G. Barry Anderson.

sota Constitution, it is perhaps not surprising that it is unclear what standard applies to constitutional analysis of this provision and which party bears the burden of proof in connection with a constitutional challenge. Usually, a statute is presumed valid and the duty is on the challenging party to prove invalidity. *Essling v. Markman,* 335 N.W.2d 237, 239 (Minn.1983). But the burden may shift to the state when a law impinges on a right recognized implicitly or explicitly in the constitution. *See, e.g., Skeen v. State,* 505 N.W.2d 299, 312 (Minn.1993). Similarly, while it is at least arguable that a higher level of scrutiny applies when a challenged statute directly impinges on a right guaranteed by the Minnesota Constitution, *see id.* at 312–13, here, at the very least, the state must show that the statute must be rationally related to achievement of a legitimate governmental purpose. *See, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Contos v. Herbst,* 278 N.W.2d 732, 741 (Minn.1979). Because the state is unable to meet these minimal analytical standards, it is not necessary to resolve these issues in the context of this appeal.

Additionally, because the Hartmanns have clearly asserted that the sale of their own meat is protected by the Minnesota Constitu-

tion, I reject the argument made by the majority and the concurring opinion that the Hartmanns somehow failed to make the required constitutional challenge to the custom slaughtering provision. While greater clarity in the argument would have been helpful, the Hartmanns have claimed from the start of these proceedings that they are constitutionally permitted to sell the products of their farm, e.g., custom slaughtered meat. I believe the issue is adequately preserved for consideration by this court in this criminal prosecution.

3. It is undisputed that Minnesota is far more urban in character than 1906, when Minnesotans amended the state constitution. Yet it is worth noting that according to the Minnesota Department of Agriculture, Minnesota currently ranks 7th in total agricultural production among the states, and is home to some 80,900 farms, comprising 55% of our state's land. And, given that the average Minnesota farm is 344 acres, smaller farm operations are still significant contributors to Minnesota agriculture. Minnesota Department of Agriculture, *Minnesota Agriculture: A Profile of Minnesota's Agriculture and its Contribution to the State Economy* at 3 (2004–05), *available at* http://www.mda.state.mn.us/maitc/agprofile.pdf.