STATE of Minnesota, Respondent,

v.

Derrick Lee WEYAUS, Appellant.

No. A12–1723.

Court of Appeals of Minnesota.

Sept. 3, 2013.

Lori Swanson, Attorney General, Jennifer Coates, Assistant Attorney General, St. Paul, MN; and Janice Jude, Mille Lacs County Attorney, Milaca, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Bridget K. Sabo, Assistant Public Defender, St. Paul, MN; and Justin P. Krypel, Special Assistant Public Defender, Faegre Baker Daniels LLP, Minneapolis, MN, for appellant.

Considered and decided by STAUBER, Presiding Judge; HUDSON, Judge; and SCHELLHAS, Judge.

## OPINION

SCHELLHAS, Judge.

Appellant challenges his conviction of second-degree assault, arguing that (1) the district court erred when it instructed the jury on the definition of a dangerous weapon consistent with CRIMJIG 13.10, and (2) the evidence was insufficient to support his conviction. We affirm.

## FACTS

Respondent State of Minnesota charged appellant Derrick Weyaus with second-degree assault with a dangerous weapon under Minn.Stat. § 609.222, subd. 1 (2010); third-degree assault (substantial bodily

harm) under Minn.Stat. § 609.223, subd. 1 (2010); and fifth-degree assault under Minn.Stat. § 609.224, subd. 1(2) (2010). The charges arose out of events that occurred on the evening of July 25, 2011, and the morning of July 26, 2011, during which Weyaus allegedly struck B.S. with a child's folding stadium chair.

During trial, B.S. testified that, on July 25, 2011, B.S. babysat his cousin L.M.'s two young children at L.M.'s home in Mille Lacs County. L.M.'s uncle also resided there. Sometime between 10:00 p.m. and midnight, L.M. went to a party at a home 30 seconds away by car; her uncle also went to the party separately. B.S. testified that he later gave D.K., someone L.M. had dated, a ride to the party. For reasons not clear in the record, after B.S. arrived at the party, an unidentified man punched B.S. in the jaw. B.S. punched back and another man attempted to punch B.S. D.K. then punched the man who attempted to punch B.S. and yelled at B.S. to return to their vehicle. B.S. then drove D.K. and himself back to L.M.'s home. Sometime later, before L.M. and her uncle returned home, B.S. stepped outside to smoke a cigarette. The next thing that B.S. recalls is waking in a hospital the next day with injuries.

L.M. testified that she and Weyaus drank alcohol at the party and that she and her uncle then walked home, arriving at around 4:00 a.m. Later, L.M. wondered about B.S.'s whereabouts and found him lying outside on the ground in a fetal position and helpless, while Weyaus hit him with a chair. A "group of girls" was with Weyaus. L.M. saw Weyaus hit B.S. with the chair twice, lifting it over his head and swinging it down onto B.S. L.M.'s uncle then came outside and confronted Weyaus, who asked L.M.'s uncle if he " 'want[ed] some too.' " L.M.'s uncle scuffled with Weyaus, eventually knocking out Weyaus. At some point, the group of girls also tried to fight L.M.'s uncle.

L.M. helped B.S. get up and come inside the house and then called 911. At the time, B.S.'s eyes were rolled back into his head, he said nothing, and he did not appear to understand the events occurring around him. L.M. told Weyaus, who was lying on the ground, and the group of girls that she had called the police. Weyaus got up and he and the group of girls ran away. L.M. then noticed that blood was "everywhere in [her] doorway" and where B.S. had been lying and that some of her vehicle's windows had been broken. She also soon noticed that B.S. was missing.

Mille Lacs Tribal Peace Officer Robert Wall arrived at L.M.'s home around the time when L.M. discovered that B.S. was missing. L.M. and her uncle provided Officer Wall consistent information about the events that had occurred, and L.M. urged Officer Wall to arrest Weyaus. Officer Wall went to Weyaus's nearby residence and discovered a vehicle with smashed-out windows and blood all over its doors. Back at L.M.'s home, Officer Wall located the folding chair, with which Weyaus had allegedly struck B.S., and eventually located B.S. about 150–200 yards away from L.M.'s home, lying unconscious beside a tree, with facial and head injuries. Officer Wall called for an ambulance and observed that, as B.S. tried to recall what happened, he became "kind of delirious."

An emergency-room treating physician testified that B.S.'s injuries included a scalp hematoma, facial contusion and swelling, neck and chest swelling with anterior chest contusions, trace amounts of blood in his urine, and a concussion. He explained that a concussion can be accompanied by loss of consciousness and temporary or permanent cognitive problems, including memory loss. The district court admitted the folding chair into evidence at

trial. It was a child's Mickey Mouse folding stadium chair. B.S. testified that he fully recovered from his injuries.

The district court denied Weyaus's judgment-of-acquittal motion, and Weyaus waived his right to testify. The jury found Weyaus guilty of all counts. The court entered judgment of conviction only as to second-degree assault with a dangerous weapon.

This appeal follows.

## ISSUES

I. Was the district court's dangerous-weapon jury instruction erroneous?

II. Was the evidence sufficient to support the conviction of second-degree assault?

## ANALYSIS

**I. The district court's dangerous-weapon instruction was not erroneous.**

 Weyaus argues that the district court's dangerous-weapon jury instruction was erroneous and requires reversal of his second-degree-assault conviction. Weyaus did not object to the jury instruction. "Failure to object to jury instructions may result in waiver of the issue on appeal," "[b]ut [an appellate court has] discretion to review instructions not objected to at trial if the instructions contain plain error affecting substantial rights or an error of fundamental law." *State v. Scruggs*, 822 N.W.2d 631, 642 (Minn.2012) (quotation omitted). An appellate court "will order a new trial only if all three prongs of the plain error standard are satisfied and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted).

"[D]istrict courts have latitude" and "broad discretion in determining jury instructions." *State v. Hayes*, 831 N.W.2d 546, 555 (Minn.2013) (quotation omitted) (stating during plain-error analysis). "A district court errs when its instructions confuse, mislead, or materially misstate the law, but if the instructions read as a whole correctly state the law in language that can be understood by the jury, there is no reversible error." *Scruggs*, 822 N.W.2d at 642 (quotation omitted).

Minnesota Statutes section 609.02, subdivision 6, defines dangerous weapon as follows:

> "Dangerous weapon" means any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, any combustible or flammable liquid or other device or instrumentality that, in the manner it is used or intended to be used, is *calculated or likely to produce* death or great bodily harm, or any fire that is used to produce death or great bodily harm.

(Emphasis added.)

10 *Minnesota Practice* CRIMJIG 13.10 (2006) reads as follows:

> A "dangerous weapon" is anything designed as a weapon and capable of producing death or great bodily harm, or any combustible or flammable liquid or anything else that, in the manner it is used or intended to be used, is *known to be capable of producing death* or great bodily harm or any fire that is used to produce death or great bodily harm.

(Emphasis added.) (Footnote omitted.)

In this case, the district court's jury instruction mirrored a portion of the language from CRIMJIG 13.10, as follows: "A 'dangerous weapon' is anything designed as a weapon and capable of producing death or great bodily harm, or anything else that in the manner it is used or intended to be used is *known to be capable*

*of producing* death or great bodily harm." (Emphasis added.) The district court's jury instruction on the definition of dangerous weapon differed, in relevant part, from Minn.Stat. § 609.02, subd. 6, by the substitution of "known to be capable of producing" for "calculated or likely to produce." Weyaus argues that, because of this difference, the court's dangerous-weapon jury instruction did not accurately convey the substance of the statutory definition in Minn.Stat. § 609.02, subd. 6, requiring reversal of Weyaus's conviction. He argues that the district court's jury instruction that mirrored CRIMJIG 13.10 instructed the jury that it could find that Weyaus used the folding chair in the alleged assault as a dangerous weapon if he used the chair merely "in a manner that *could* have resulted in great bodily harm." (Emphasis added.) We disagree.

### A. Interpretation of Minn.Stat. § 609.02, subd. 6

An appellate court reviews questions of statutory interpretation de novo, *State v. Wilson,* 830 N.W.2d 849, 852 (Minn.2013), as legal questions, *State v. R.H.B.,* 821 N.W.2d 817, 820 (Minn.2012). An appellate court's "goal in statutory interpretation is to ascertain and give effect to the Legislature's intent." *Sanchez v. State,* 816 N.W.2d 550, 556 (Minn.2012). An appellate court, when interpreting a statute, must apply its unambiguous plain meaning, *State v. Hayes,* 826 N.W.2d 799, 804 (Minn.2013), and, in doing so, may consider "dictionary definitions," *State v. Heiges,* 806 N.W.2d 1, 15 (Minn.2011), and *"Black's Law Dictionary," Goodman v. Best Buy, Inc.,* 777 N.W.2d 755, 759 n. 2 (Minn.2010) (citing cases including *State v. Hartmann,* 700 N.W.2d 449, 454 (Minn.2005) (using *Black's Law Dictionary* to determine the meaning of "product")).

"[C]alculated" means "intended," and "[l]ikely" means "probable" or "reasonably expected." *The New Shorter Oxford English Dictionary on Historical Principles* 318, 1588 (1993 ed.); *see also State v. Tice,* 686 N.W.2d 351, 353–55 (Minn.App.2004) (defining " 'likely' " in context of child-neglect and child-endangerment statutes as " 'more likely than not,' " noting that *Black's Law Dictionary* 925 (6th ed.1990) defined " 'likely' " as " '[p]robable' "), *review denied* (Minn. Nov. 16, 2004). A fact is known to a person if that person has "a state of mind in which [that] person has no substantial doubt about the existence of [the] fact." *Black's Law Dictionary* 950 (9th ed.2009) (defining "knowledge"); *see also* Minn.Stat. § 609.02, subd. 9(2) (2010) (defining " '[k]now' " as requiring "only that the actor believes that the specified fact exists"). "[C]apable" means "[h]aving the ability, power, or fitness for some specified purpose or activity." *Shorter Oxford English Dictionary* 331.

■ A district court does not commit reversible error when its instructions "read as a whole correctly state the law in language that can be understood by the jury." *Scruggs,* 822 N.W.2d at 642 (quotation omitted). We hold that CRIMJIG 13.10 correctly states the statutory dangerous-weapon definition in language that a jury can understand. We therefore conclude that the district court's CRIMJIG 13.10–based instruction, read as a whole, correctly stated the law in language that the jury could understand and that the court did not err by instructing the jury on the statutory dangerous-weapon definition by using language that mirrored CRIMJIG 13.10. Because we conclude that the district court did not err, we need not reach the remaining plain-error prongs.

### B. Caselaw Analysis

In *State v. Graham,* 366 N.W.2d 335, 338 (Minn.App.1985), we noted our concern

that the inclusion of the likely-to language in a dangerous-weapon jury instruction risked dilution of the state's burden of proof. At that time, a previous version of CRIMJIG 13.10–10 *Minnesota Practice,* CRIMJIG 13.06 (Supp.1984)—defined dangerous weapon as including "anything else which, in the manner it is used or intended to be used, is *likely to* produce death or great bodily harm." (Emphasis added.) In *Graham,* we stated that the remedy for that risk was to instruct the jury with language that informed the jury of the statute's substance "without using the offending or confusing language." 366 N.W.2d at 338. In a footnote, we noted our approval of the definition of deadly weapon contained in the Model Penal Code § 210 (1974), quoting it as " 'any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is *known to be capable of producing* death or serious bodily injury.' " *Id.* at 338 n. 1 (emphasis added). But we "did not suggest that 'known to be capable of' was synonymous with 'likely' "; we suggested "only that the Model Penal Code definition [of deadly weapon] was more consistent with the state's burden of proof." *Tice,* 686 N.W.2d at 354 (discussing *Graham,* 366 N.W.2d at 338 n. 1). "The standard jury instruction was later amended accordingly." *Id.*

Four months after we filed *Graham,* we filed *State v. Jensen,* 373 N.W.2d 364, 365–66 (Minn.App.1985), *review denied* (Minn. Oct. 11, 1985), noting that the *Graham* court's statement that a dangerous-weapon-definition instruction should not include the likely-to language was only a "suggest[ion]" and "merely advisory." Weyaus argues that the *Jensen* court's "merely advisory" language pertained to the *Graham* court's approval of the deadly-weapon definition found in the Model Penal Code, as referenced in *Graham.* Weyaus is mis-

taken. In *Jensen,* we did not mention the MPC's deadly-weapon definition.

The supreme court filed its opinion in *State v. Gebremariam,* 590 N.W.2d 781 (Minn.1999), when another previous version of CRIMJIG 13.10–10 *Minnesota Practice* 13.06 (Supp.1998)—defined dangerous weapon as including "anything else which, in the manner it is used or intended to be used, is *known to be capable of producing* death or great bodily harm." (Emphasis added.) In *Gebremariam,* the district court gave the jury three different instructions on the definition of dangerous weapon. 590 N.W.2d at 782. In the district court's first instruction, it erroneously defined a dangerous weapon as " 'anything designed as a weapon and . . . known to be capable of producing great bodily harm,' " instead of " 'anything which in the manner it is used or intended to be used is known to be capable of producing death or great bodily harm.' " *Id.* at 783 (second quotation of CRIMJIG 13.06). In its second instruction, the district court erroneously defined a dangerous weapon as " 'anything designed as a weapon and . . . known to be capable of producing death or great bodily harm.' " *Id.* The parties did not dispute that the court's first two jury instructions were erroneous. 590 N.W.2d at 784 (Anderson, J., concurring). In its third instruction, the district court "followed the *appropriate* CRIMJIG standard," *id.* (emphasis added), even though "CRIMJIG 13.06[was] itself at variance with the statutory definition of a dangerous weapon." *Id.* at 783 & n. 1. The supreme court stated that "[u]ltimately the jury was accurately instructed on the elements of the charged offense." *Id.*

Weyaus argues that the supreme court's approval of the district court's use of CRIMJIG 13.06 was dictum and therefore not binding. We agree. The supreme court stated: "[T]here is no contention . . .

that the third set of instructions [based on CRIMJIG 13.06] was not error-free." *Gebremariam*, 590 N.W.2d at 784 (footnote omitted); *see, e.g., id.* at 786 n. 1 (Gilbert, J., dissenting) ("[B]oth parties conceded at trial and on appeal that the CRIMJIG [13.06] definition was proper."). We conclude that the supreme court's approval of CRIMJIG 13.06 in *Gebremariam* was obiter dictum; neither obiter dicta nor judicial dicta are precedential. *See League of Women Voters Minn. v. Ritchie*, 819 N.W.2d 636, 681 (Minn.2012) ("Obiter dictum is a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." (quotation omitted)); *see also State v. Rainer*, 258 Minn. 168, 177–78, 103 N.W.2d 389, 395–96 (1960) (discussing obiter and judicial dicta).

But, relevant to this appeal, we are persuaded that the supreme court correctly endorsed the language in CRIMJIG 13.06, and we conclude that the district court's use of language from CRIMJIG 13.10 accurately instructed the jury on the elements of the charged offense. We reject Weyaus's contention that, by using the language of CRIMJIG 13.10, "known to be capable of," instead of the statutory language, "calculated or likely to," the court failed to correctly instruct the jury about the statutory dangerous-weapon definition in language that the jury could understand. We conclude that the district court did not err in its instruction to the jury on the definition of dangerous weapon.

## II. Sufficient evidence supported Weyaus's second-degree-assault conviction.

■ Weyaus argues that the evidence was insufficient to support his conviction of second-degree assault with a dangerous weapon.

When reviewing the sufficiency of the evidence leading to a conviction, [an appellate court] view[s] the evidence in the light most favorable to the verdict and assume[s] that the factfinder disbelieved any testimony conflicting with that verdict. The verdict will not be overturned if, giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense.

*State v. Hayes*, 831 N.W.2d 546, 552 (Minn.2013) (quotations omitted). A second-degree-assault conviction under Minn. Stat. § 609.222, subd. 1, requires proof that the defendant "assault[ed] another with a dangerous weapon," which includes a "device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm" under Minn.Stat. § 609.02, subd. 6.

■ Weyaus argues that the evidence was insufficient to establish that the folding chair with which he allegedly assaulted B.S. was a dangerous weapon. "When determining whether an object … is a dangerous weapon, the court must examine not only the nature of the object itself, but also the manner in which it was used." *State v. Basting*, 572 N.W.2d 281, 285 (Minn.1997). "Some things that are not ordinarily thought of as dangerous weapons become dangerous weapons if so used." *State v. Trott*, 338 N.W.2d 248, 252 (Minn.1983) ("[A] board of this nature qualifies as a dangerous weapon if so used."); *see, e.g., State v. Upton*, 306 N.W.2d 117, 117–18 (Minn.1981) (pool cue); *State v. Mings*, 289 N.W.2d 497, 498 (Minn.1980) (cowboy boots); *State v. Born*, 280 Minn. 306, 306–08, 159 N.W.2d 283, 283–85 (1968) (fists and feet). And the supreme court is inclined to give the dan-

gerous-weapon definition in Minn.Stat. § 609.02, subd. 6, an "expansive interpretation." *LaMere v. State*, 278 N.W.2d 552, 555 (Minn.1979); *see also Graham*, 366 N.W.2d at 337 ("[T]he definition of dangerous weapon in subdivision 6 must be expressed in flexible terms and be broad and inclusive.").

L.M. testified that she saw Weyaus twice hit B.S. with the chair, lifting it over his head and swinging it down onto B.S., while he lay helpless on the ground in a fetal position. Officer Wall found B.S. lying unconscious beside a tree, with facial and head injuries. The emergency-room physician assistant, who treated B.S., testified that B.S.'s injuries included a concussion, scalp hematoma, facial contusion and swelling, neck and chest swelling with anterior chest contusions, and trace amounts of blood in his urine. Although B.S. testified that he fully recovered by the trial held about 11 months after the incident, he also testified that he did not recall what happened between the time he stepped outside on July 26, 2011, and awoke the next day in a hospital. *Cf. State v. Stafford*, 340 N.W.2d 669, 670 (Minn.1983) (noting without deciding that, "[a]rguably, 'great bodily harm' is inflicted if one knocks someone out briefly"); *State v. Gorman*, 532 N.W.2d 229, 233 (Minn.App. 1995) ("A state of unconsciousness verging on shock has been held to satisfy the higher standard of 'great bodily harm.'") (quoting *State v. Jones*, 266 N.W.2d 706, 710 (Minn.1978) (rejecting Jones's argument that insufficient evidence justified finding that victim suffered great bodily harm when victim was found "unconscious and on the verge of shock," "did not regain consciousness until the following day," "remained hospitalized for a week," about two weeks after the attack almost suffered a miscarriage, and at trial still felt numbness in her teeth)), *aff'd*, 546 N.W.2d 5 (Minn. 1996).

Weyaus relies on B.S.'s injuries to argue that his manner of using the folding chair in assaulting B.S. was not calculated or likely to produce at least great bodily harm, as required by Minn.Stat. § 609.02, subd. 6. *See* Minn.Stat. § 609.02, subd. 8 (2010) ("'Great bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or *other serious bodily harm*." (emphasis added)). We are not persuaded. "[T]he victim need not suffer *any* bodily harm" "[f]or a conviction of second-degree assault under Minn.Stat. § 609.222, subd. 1," and "whether an object is a dangerous weapon [does not] turn[ ] on the nature or severity of *the victim's injuries*." *Basting*, 572 N.W.2d at 285 & n. 8.

Weyaus argues that L.M.'s identification of him as the perpetrator of the assault on B.S. was insufficiently reliable. He argues that L.M.'s initial identification of him to Officer Wall was suspect, due to L.M.'s intoxication and the time of day, sunrise, when the lighting may not have been very good. Weyaus's arguments are unavailing. "[A] conviction may be based on a single person's testimony." *State v. Cao*, 788 N.W.2d 710, 717 (Minn.2010). Weyaus's trial counsel zealously and extensively cross-examined L.M. about the veracity and accuracy of her identification of Weyaus and, during his closing argument, emphasized L.M.'s lack of credibility and alcohol consumption. "Assessing witness credibility and the weight given to witness testimony is exclusively the province of the jury." *State v. Pendleton*, 759 N.W.2d 900, 909 (Minn.2009); *see State v. Hurd*, 819 N.W.2d 591, 598 (Minn.2012) ("As the fact finder, the jury is in the best position to weigh credibility and thus determines

which witnesses to believe and how much weight to give their testimony." (quotation omitted)); *see also Scruggs*, 822 N.W.2d at 645 (stating that "[i]t was properly left to the jury to assess her credibility and determine the weight it believed her testimony deserved" and rejecting argument that witness was "not a credible witness and that her testimony was false and 'full of improbabilities and inconsistencies,'" noting that witness was "vigorously cross-examined").

Weyaus relies on the supreme court's reversal of a conviction in *State v. Kemp*, 272 Minn. 447, 450, 138 N.W.2d 610, 612 (1965), when the evidence was "completely dependent upon a single witness whose testimony ... [was] of dubious veracity." But the facts in *Kemp* materially differed from this case because, among other reasons, unlike Weyaus's trial counsel, Kemp's trial counsel made no attempt to impeach "the only witness who identified [Kemp] as the culprit." 272 Minn. at 448–50, 138 N.W.2d at 610–12 ("[T]he jury ... decided the case without the benefit of ... evidence which could have been presented had the additional alibi witness been called as well as others.... Surely the jury's confidence in complainant's testimony would have been affected, and doubtless more so if impeachment had been attempted.").

We conclude that the evidence was sufficient to support Weyaus's conviction of second-degree assault with a dangerous weapon.

## DECISION

The district court did not err by instructing the jury with the dangerous-weapon instruction found in CRIMJIG 13.10 (2006) because CRIMJIG 13.10 accurately conveys the substance of the dangerous-weapon definition found in Minn. Stat. § 609.02, subd. 6. Sufficient evidence supported Weyaus's second-degree-assault conviction.

**Affirmed.**